In re **MILLER & RHOADS, INC.**, Chapter 7 Debtor.

**MILLER & RHOADS, INC. SECURED CREDITORS' TRUST, Plaintiff,**

v.

**ROBERT ABBEY, INC., et al., Defendants.**

**MILLER & RHOADS, INC. SECURED CREDITORS' TRUST, Plaintiff,**

v.

**AIRWAYS INDUSTRIES, INC., et al., Defendants.**

**Bankruptcy No. 89–01763–RT.**
**Adv. Nos. 90–3183–T, 90–3184–T.**

United States Bankruptcy Court, E.D. Virginia, Richmond Division.

June 30, 1992.

Howard Feller, McGuire, Woods, Battle & Boothe, Richmond, Va., for plaintiff.

Kevin R. Huennekens, Maloney, Yeatts & Barr, Richmond, Va., for defendants.

## MEMORANDUM OPINION

DOUGLAS O. TICE, Jr., Bankruptcy Judge.

In this chapter 11 case, the debtor's confirmed plan of liquidation transferred to a trust for secured creditors all of the debtor's claims for preferential transfers pursuant to 11 U.S.C. § 547. The debtor had made numerous payments on its accounts payable and other debt within 90 days of filing bankruptcy, which payments are the subject of these two adversary proceedings.

A major issue with all of the unresolved preference claims concerns whether the debtor was insolvent at the time payments were made. A trial limited solely to the insolvency issue was held beginning July 22, 1991, following which the court took this issue under advisement pending further settlement negotiations between the parties. The parties have now requested the court to make a ruling, and they have submitted proposed findings of fact and conclusions of law.

For the reasons stated in this opinion the court finds that the debtor was insolvent for all purposes of 11 U.S.C. § 547(b)(3).

### *Findings Of Fact*
### BACKGROUND

The debtor, Miller & Rhoads, Inc. (M & R), was established in Richmond, Virginia, in 1886 under the ownership of Linton O. Miller and Webster S. Rhoads. During its formative years, the firm earned a reputation as a "carriage trade" department store with a broad range of merchandise and services as well as a high regard for the shopping comfort of its customers. M & R's business growth was quite successful, and in 1909 the firm moved to a larger facility in downtown Richmond. The downtown flagship location was expanded over the years. Among the many pioneering innovations in the store's growth were electric lighting, escalators, elevators and complete air conditioning.

Linton Miller died in 1917. Webster Rhoads continued to guide the store's growth as a full line, full service department store until his death in 1941. Under the tenure of Webster Rhoads, Jr., M & R expanded its operations beyond Richmond. New stores were opened in Charlottesville, Roanoke, and Lynchburg, Virginia. During the 1960's, M & R management recognized the trend to suburban shopping centers sweeping the retail industry, and the company opened a number of shopping center stores, including expansion to Newport News, Norfolk and Virginia Beach, Virginia.

In 1967, just prior to the death of Mr. Rhoads, Jr., M & R merged with Garfinckel's of Washington, D.C., to form Garfinckel's, Brooks Brothers, Miller & Rhoads, Inc. (Garfinckel's). For the next fifteen years, the M & R division continued its expansion into larger regional malls with the opening of seven full line department stores and six fashion specialty stores and including four stores in North Carolina.

In 1981, Allied Stores, Inc. (Allied), acquired Garfinckel's. Campeau Corporation (Campeau) acquired Allied in November 1986. Shortly after this acquisition, Campeau through its subsidiary, Allied, put M & R up for sale.

M & R Acquisition Corp. purchased M & R in September 1987 in what is commonly referred to as a leveraged buy-out. M & R Acquisition had been formed by a private investor and M & R management for this purpose. The acquisition transaction was consummated September 16, 1987, for a price of approximately $57,947,000.00.

In connection with the buy-out of M & R, General Electric Capital Corporation (GECC) provided several loans including a revolving line of credit. The GECC financing package was considered as one loan, secured by most of the company's assets. M & R also was liable under industrial development revenue bonds payable to Sovran Bank, N.A., and secured by a store in Virginia Beach. Under the GECC buy-out financing, M & R was obligated for substantial monthly payments as well as short term maturity dates.

The retail economy declined subsequent to M & R Acquisition's purchase of M & R and the October 1987 stock market crash.

The retail environment further worsened in the spring of 1988 as a result of consumer rejection of women's fashion merchandise, particularly offerings of shorter hemlines. Prior to the fall 1988 season, M & R decided to change its focus to a more designer-oriented fashion and better priced ready-to-wear apparel. In this connection the company made commitments that moved it too far into less productive lines of merchandise. M & R's deep and abrupt change in merchandise mix caused declines in gross profits, which continued into the critical 1988 Christmas season. In December, both M & R's president and executive vice president resigned.

Vendors and suppliers began restricting or eliminating credit lines because of M & R's deteriorating financial performance, and the company was forced to make prepayments or accept accelerated terms. The firm's inability to obtain sufficient lines of credit from suppliers resulted in missed deliveries, late deliveries or substitutions of unordered merchandise. M & R was unable to properly inventory its stores, resulting in a further decline in sales and profits.

Although M & R negotiated with its creditors and even reached a tentative payment accord in the spring of 1989, it was ultimately unable to comply with its projected payments.

Unable to pay its debts as they matured, M & R sought bankruptcy protection by filing its chapter 11 petition in this court on July 28, 1989. As debtor-in-possession, the company continued to manage and operate its business after filing the bankruptcy petition.

During debtor's post petition operations, the court approved an arrangement for debtor's use of GECC cash collateral as well as new financing by GECC under which it was granted super priority status. Unfortunately, debtor was unable to continue in business and determined that its only course was to liquidate.

On November 27, 1989, debtor filed its initial plan of liquidation. The disclosure statement and the debtor's first amended and restated plan of liquidation (once modified) were filed on April 30, 1990. The first amended and restated plan of liquidation (twice modified) (the Plan) was confirmed by the court in June 1990.

Defendant Retail Communications Corporation was a member of the unsecured creditors' committee. During the negotiations that preceded the confirmation of debtor's plan, the unsecured creditors' committee sought to obtain the right to bring preference claims for the benefit of the unsecured creditors. In lieu of such an arrangement, debtor's primary secured creditor, GECC, agreed to contribute $2,500,000.00 in cash to the distribution fund for the unsecured creditors. In exchange for this payment, which assured the unsecured creditors of a certain distribution on their claims, M & R's preference claims were assigned under the plan to the plaintiff secured creditors' trust, which is a liquidating trust acting on behalf of the secured creditors, and GECC was made the principal beneficiary of this trust. This arrangement was negotiated and agreed to by the unsecured creditors' committee.

The assignment of the preference claims to the secured creditors' trust was disclosed in the debtor's disclosure statement and was described in the plan. No creditor objected to this provision of the plan.

Section 5.07 of the plan specifically vested in the trustees of the secured creditors' trust all of the rights and powers of a trustee appointed under Bankruptcy Code § 1104 with regard to the administration and liquidation of the "Remaining Property", which was defined in § 1.35 of the plan to include preference claims. Thus, pursuant to the plan the debtor transferred and assigned all of its right, title and interest in its preference claims to the secured creditors' trust, acting in the capacity of a § 1104 trustee.

In September 1990, the secured creditors' trust filed the instant two adversary proceedings against a total of approximately 117 defendants to recover preferential transfers under Bankruptcy Code § 547. 11 U.S.C. § 547. On July 22, 1991, preference actions were still pending against approximately 24 defendants, and these re-

maining defendants asserted the defense that M & R was not insolvent at the time of the transfers. The court consolidated the two adversary proceedings for the purpose of determining whether the debtor was insolvent when it filed for bankruptcy. Trial on the insolvency issue began on July 22, 1991.

## INSOLVENCY

By September, 1989, M & R had lost substantial amounts of money since the 1987 leveraged buy-out. It was losing money in every store on an operating basis before loan interest payments. Inventory levels, sales levels, gross profit margins, operating expenses, sales per square foot and capital expenditures were all well below industry average. M & R's poor financial condition was due to operating problems that were much deeper than the interest payments resulting from the leveraged buy-outs. In the summer of 1989, M & R had negative equity of $13,000,000.00 and was at a competitive disadvantage in every area of retail performance. M & R was not financially viable during the period of April through July 1989 and was not salvageable. At that time M & R's chances of reorganizing were nonexistent unless it received a substantial infusion of new equity capital of at least $30,000,000.00, which it never received.

The accounting firm of Price Waterhouse had been engaged to audit M & R's financial statements for the fiscal year ended July 30, 1988. During the course of its audit in the late summer and early fall of 1988, Price Waterhouse developed substantial doubt that M & R would be able to continue to operate as a going concern for the next twelve months. This conclusion was based on the fact that M & R had suffered large losses, its liabilities exceeded its assets, it was in default on a number of loan covenants, and it did not have adequate cash flow to meet its obligations. Specifically, Price Waterhouse determined that M & R had lost $3,300,000.00 for the period ending July 30, 1988, and had negative shareholder equity of $2,300,000.00 at that time. Price Waterhouse then prepared a draft audit opinion letter for the July, 1988, financial statements which contained a going concern qualification and told M & R that it would have to correct its financial problems before the going concern qualification could be removed. On April 29, 1989, M & R had negative shareholder equity of approximately $13,000,-000.00 and had not cured the defaults on its loans.

Price Waterhouse was never able to resolve the going concern issue for the July, 1988, financial statements, and as a result audited financial statements for the fiscal year ending July 30, 1988, were never completed. On July 28, 1989, when M & R filed for bankruptcy, it had suffered a net loss of $14,700,000.00 for the 1989 fiscal year, and there was negative shareholders' equity of $16,500,000.00. M & R was in severe financial straits when it filed for bankruptcy.

M & R had lost money on a consistent basis since the leveraged buy-out in September, 1987. The company incurred substantial losses through the end of 1988, and during the first half of 1989 its losses continued to grow. M & R's financial statements indicate that the company had an operating loss before interest and a net loss in every month from July, 1988, to July, 1989, with the exception of December, 1988. However, even the December, 1988, net profit was substantially below the budgeted amount, and M & R's then president was asked to resign because of the company's poor operating results. In addition, M & R's sales decreased from 1988 to 1989, and its inventory levels were inadequate. By April, 1989, M & R was not financially viable because of the company's substantial losses and poor cash flow situation and was in danger of having to cease operations.

In the summer of 1989, M & R was in substantial default on its loan payments to GECC. GECC held security interests on various real property interests of M & R and on the company's furniture, fixtures, equipment, inventory and accounts receivable. Because of M & R's default, GECC had the right to foreclose on M & R's

property at any time, which would have forced M & R out of business.

At the time M & R filed its bankruptcy petition on July 28, 1989, it was no longer financially viable and could operate only for a short time and with the benefit of the automatic stay and other bankruptcy protections.

When M & R filed for bankruptcy its chances of surviving and reorganizing were dependent upon obtaining at least $20,000,-000.00–$30,000,000.00 in new equity capital. It would also have been essential for it to generate cash through the sale of its poorest performing assets, and to meet its post-petition operating goals for sales, inventory and reduced losses. However, the secured and unsecured creditors would have to accept substantial reduction of their claims. These goals could not be achieved.

At the time debtor filed bankruptcy, its liabilities were as follows:

| | |
|---|---|
| Priority Wages | $ 2,628,976.11 |
| Deposits | 315,335.31 |
| Federal Taxes Due | 42,944.42 |
| State Taxes Due | 694,259.99 |
| Other Taxes Due | 1,583.98 |
| Secured Debt | 73,331,790.04 |
| Unsecured Claims | 20,045,315.58 [1] |
| Total (approximate) | $97,060,205.48 |

On the date debtor filed its chapter 11 bankruptcy petition and during the ninety days prior to filing, the values of its assets were as follows:

| | |
|---|---|
| Real Property, including lease-holds | $28,788,563.00 |
| Cash on Hand | 915,289.20 |
| Deposits | 323,331.37 |
| Furniture, fixtures, equipment, supplies & vehicles | 7,021,933.00 |
| Inventory | 14,914,240.00 |
| Accounts Receivable, other liquidated debt | 24,268,634.18 |
| Contingent and unliquidated claims | 35,621.83 |
| Total (approximate) | $76,267,612.58 [2] |

*Discussion and Conclusions of Law*

These adversary proceedings were brought on plaintiff's complaints for preference. The sole issue presently before the court is whether M & R was insolvent on and during the ninety days prior to the date of filing its chapter 11 petition in bankruptcy.

■ A trustee may recover Code-defined preferential transfers of property of the debtor made while the debtor was insolvent. 11 U.S.C. § 547. The debtor is presumed to be insolvent on and during the ninety days preceding the date of the filing of the petition. 11 U.S.C. § 547(f). This presumption requires preference defendants to come forward with evidence to rebut the presumption.

■ The Bankruptcy Code defines insolvency as a "financial condition such that the sum of [an] entity's debt is greater than all of such entity's property, at fair valuation...." 11 U.S.C. § 101(31). Thus, a "balance sheet" test based upon asset values is used for the purpose of establishing insolvency in a preference action under § 547.

Here, the first step in determining the insolvency issue is to determine how to value the debtor's assets. *See, Neuger v. Casgar (In re Randall Construction)*, 20 B.R. 179, 183 (N.D.Ohio 1981). Once the proper valuation standard is determined, the court must decide the value of the assets and then whether M & R's liabilities exceeded that value.

■ "Fair valuation" for purposes of § 101(31) is generally defined as the going concern or fair market price "[u]nless a business is on its deathbed." *Utility Stationery Stores, Inc. v. Southworth Co. (In re Utility Stationery Stores, Inc.)*, 12 B.R. 170, 176 (Bankr.N.D.Ill.1981). Where a business is in a precarious financial condition or on its deathbed, the assets should be valued on a liquidation rather than a going concern basis. *Matter of Taxman Clothing Co.*, 905 F.2d 166, 170 (7th Cir. 1990); *Fryman v. Century Factors, Factor for New Wave (In re Art Shirt Ltd.)*, 93 B.R. 333, 341 (E.D.Pa.1988); *Neuger*, 20 B.R. at 198.

---

1. This figure includes disputed claims and is therefore subject to reduction. Even a substantial reduction of the unresolved claims would not materially affect the court's findings.

2. The asset values are determined on a liquidation analysis. See discussion *infra*.

■ The bankruptcy court in *Fryman* explained the rationale for using liquidation value in certain cases as follows:

> [I]f a company is "on its deathbed" or is nominally in existence, however, application of the going concern value is not appropriate ... To treat such a company as a going concern would be misleading and would, in fact, fictionalize the company's true financial condition.... [citations omitted]

*Fryman,* 93 B.R. at 341.

The evidence of M & R's extremely precarious financial position when it filed bankruptcy, as summarized in the court's findings of fact, is overwhelming and in large part uncontroverted. For example, in order to continue as a going concern the debtor required a minimum $20,000,000.00 equity capital infusion. This was never likely, and liquidation was imminent when the petition was filed. The firm could continue in business postpetition for only a brief period due to the protection from creditors allowed a debtor-in-possession. Liquidation in fact promptly ensued.

This court therefore concludes that liquidation is the proper valuation standard for determining whether M & R was insolvent when it filed for bankruptcy and during the preceding ninety days. My findings of fact reflect assets at liquidation values in the total sum of $76,267,612.58 and total liabilities of $97,060,205.48. Since I have found the fair valuation of the debtor's assets to be less than its liabilities, I conclude the debtor was insolvent for purposes of the plaintiff's preference actions against the defendants.

Defendants argue that going concern rather than liquidation values should by used by the court. However, rather than looking to the valuation evidence at trial, plaintiff's argument relies predominantly on the fact that M & R's petition schedules of assets and liabilities, filed shortly after the case was commenced, reveal an excess of assets over liabilities.

■ Numerous cases have held that the schedules are not dispositive or controlling and that courts should rely upon more accurate evidence, such as current appraisals, opinion testimony or actual sales of the assets in determining insolvency. *See, Pembroke Development Corp. v. A.P.L. Window (In re Pembroke Development Corp.),* 122 B.R. 610, 612 (Bankr.S.D.Fla. 1991); *Neuger,* 20 B.R. at 184. Moreover, scheduled asset values are not determinative where the debtor can show errors in the schedules. *Murphy v. Valencia (In re Duque Rodriguez),* 75 B.R. 829, 832 (Bankr.S.D.Fla.1987). In fact, courts have allowed debtors to introduce evidence in a later proceeding to show that their original schedules filed with the court were incorrect. One court explained that:

> asset valuations in bankruptcy schedules are often exaggerated and are based on cost, book value less depreciation and other academic or artificial criteria that have little relation to sale or market value. It is clearly the law that such representations of debtors ... are not res judicata either as to creditors or the bankrupt, but are ex parte statements binding only on the bankrupt if they are not discredited or amended.

*Bigler v. American Mutual Liability Insurance Company (In the Matter of Bollinger Corp.),* 11 C.B.C. 563, 565 (Bankr. W.D.Pa.1976) *(citing, Horner v. Hamner,* 249 F. 134 (4th Cir.1918)). *See also, Pembroke Development Corp.,* 122 B.R. at 612 ("current appraisals of a debtor's assets afford a more accurate determination of a debtor's solvency than can be had solely by reference to a balance sheet"); *Knapp v. Applewhite (In re Knapp),* 119 B.R. 285, 288 (Bankr.M.D.Fla.1990); *W.L. Mead, Inc. v. Central States Pension Fund (In re W.L. Mead, Inc.),* 70 B.R. 651 (Bankr. N.D.Ohio 1986); *Carlson v. Rose (In re Rose),* 86 B.R. 193, 195 (Bankr.W.D.Mo. 1988) (overstatement of value of assets in bankruptcy schedules is not enough to rebut presumption of insolvency); *Howdeshell of Ft. Myers v. Dunham–Bush, Inc. (In re Howdeshell of Ft. Myers),* 55 B.R. 470, 473 (Bankr.M.D.Fla.1985) (court is not required to accept erroneous valuation in schedules); *Energy Cooperative, Inc. v. Cities Service Co. (In re Energy Coopera-*

*tive, Inc.)*, 109 B.R. 822, 824 (Bankr.N.D.Ill. 1989).

The evidence before this court demonstrates plainly that M & R's schedules were materially flawed, especially with regard to the real property values, and that the defendants' reliance on these values is insufficient to overcome the presumption of insolvency under § 547(f). I rely upon independent evidence of the value of the assets, including the analysis of the unsecured creditor committee's accountants, a contemporaneous appraisal, opinion testimony and actual sales price, in determining whether M & R was insolvent when it filed for bankruptcy.

## JUDICIAL ESTOPPEL ARGUMENT

Prior to trial, defendants filed a motion for summary judgment on the issue of judicial estoppel, a doctrine which serves to preclude a party from intentionally using self-contradictory positions during the course of litigation to obtain an unfair advantage. *See generally, Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166 (4th Cir.1982); *see also, United Virginia Bank v. B.F. Saul Real Estate*, 641 F.2d 185, 190 (4th Cir.1981). The defendants' summary judgment motion was denied. However, the defendants renewed this motion at trial. Their motion contends that the plaintiff, as M & R's successor in interest, is judicially estopped from bringing the preference actions because of two inconsistent positions it has assumed.

■ First, the defendants argue that the doctrine of judicial estoppel bars plaintiff, the secured creditors' trust, from offering evidence of M & R's insolvency because of the valuation evidence presented by M & R at the early cash collateral hearing in the bankruptcy case. The court finds that the doctrine of judicial estoppel does not apply under these circumstances. Under Bankruptcy Code § 506(a) and the cases interpreting that section, valuation is determined on a case-by-case basis in light of the specific purpose of the heading; valuation evidence presented early in a case is not binding and does not have preclusive effect in a later hearing in the same case. M &

R's early case position was based on its historical financial records rather than the liquidation approach to valuation presented at trial.

Furthermore, plaintiff was not the party that gave the challenged testimony at the cash collateral hearing. The plaintiff did not participate or present any testimony in the prior proceeding and did not take any prior inconsistent positions in this case. Since there was no privity between the plaintiff and M & R, the right of plaintiff to pursue the preference actions is not limited or estopped by the statements of the debtor. The plaintiff is not asserting an action belonging to the debtor but rather is asserting an action in a representative capacity for the benefit of creditors, and as a result it cannot be estopped by prior statements of the debtor.

■ The defendants' second argument for evoking the doctrine of judicial estoppel is their claim that the existence of preferential actions was disclosed in neither the confirmed Chapter 11 plan nor the disclosure statement. This argument is rejected by the court for several reasons.

The plan and disclosure statement specifically disclosed the existence of potential preference actions and the assignment of the preference actions to the plaintiff, which was acting on behalf of M & R's secured creditors, principally GECC. This assignment was negotiated by the unsecured creditors' committee and GECC and was agreed to in exchange for GECC's contribution to the distribution fund for the unsecured creditors. GECC paid $2,500,-000.00 to the unsecured creditors under the plan and, in return, obtained the right to assert the preference claims. In this light, it would be highly inequitable to apply the doctrine of judicial estoppel and effectively destroy the pre-confirmation agreement made by the unsecured creditors' committee to assign the preference claims to the plaintiff in exchange for the substantial cash value from GECC.

Since the court now holds that M & R was insolvent for all preference purposes,

the clerk will schedule new pretrial conferences for the remaining issues.