## In re PAYLESS CASHWAYS, INC.

### Silverman Consulting, Inc., Chapter 11 Trustee, Plaintiff,

v.

### Hitachi Power Tools, U.S.A., Ltd., the Valspar Corporation, the Scotts Company, Crane Plumbing Corporation, and Osram Sylvania, Defendants.

Bankruptcy No. 01–42643.
Adversary Nos. 02–4055, 02–4078.

United States Bankruptcy Court,
W.D. Missouri.

March 14, 2003.

Benjamin F. Mann, Terrance M. Summers, Heather B. Wolesky, Blackwell, Sanders, Peper, Martin, Kansas City, MO, for Plaintiff.

Paul D. Sinclair, Sinclair, Haynes & Cowing, P.C., Kansas City, MO, Peter S. Partee, Hunton & Williams, Richmond, VA, for Defendants.

## MEMORANDUM OPINION

ARTHUR B. FEDERMAN, Chief Judge.

Silverman Consulting, Inc. (Silverman), the Chapter 11 trustee for debtor Payless Cashways, Inc. (Payless) filed adversary proceedings against Hitachi Power Tools, U.S.A. Ltd., The Valspar Corporation, The Scotts Company, Crane Plumbing Corporation, and Osram Sylvania (the Defendants), among others, to avoid alleged preferential transfers. This is a core proceeding under 28 U.S.C. § 157(b)(2)(F) over which the Court has jurisdiction pursuant to 28 U.S.C. § 1334(b), 157(a), and 157(b)(1). The following constitutes my Findings of Fact and Conclusions of Law in accordance with Rule 52 of the Federal Rules of Civil Procedure as made applicable to this proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## ISSUE PRESENTED

The Bankruptcy Code (the Code) authorizes the trustee to avoid a transfer made

within 90 days of a bankruptcy filing if, on the date the transfer was made, the debtor was insolvent or became insolvent as a result thereof. Payless was solvent within 90 days prior to filing its bankruptcy petition if its assets are valued as a going concern, however, Payless was insolvent if its assets are valued at liquidation value. A business is a going concern if it is operating, unless it is on its deathbed. Payless began liquidating its assets within three months after filing a Chapter 11 bankruptcy petition. Was Payless on its deathbed at any time during the 90 days prior to filing its bankruptcy petition?

## DECISION

Throughout the preference period, Payless operated in excess of 100 stores, received advances from its lenders, and maintained operations consistent with past practices, as modified upon the advice of its investment advisors. Its strongest selling season had in the past run from May through September. Payless had good sales in April, but its inventory lenders restricted credit such that it was not able to replace inventory at the beginning of the selling season. On May 13, 2001, one of Payless' inventory lenders suggested that it file a Chapter 11 bankruptcy petition, which was contrary to the advice of its investment advisors. Payless filed for bankruptcy protection on June 4, 2001. From May 13, 2001, until it obtained debtor-in-possession financing on July 19, 2001, Payless was unable to obtain goods on credit from a significant number of its trade vendors. That fact, and an increase in lumber prices in the spring, meant that Payless was not effectively able to offer product to its customers during what should have been its strongest selling season. The decision to file the bankruptcy case, and the inability thereafter to obtain goods on credit, doomed the company. I, therefore, find that Payless' assets should

be valued at going concern value until May 13, 2001. Thereafter Payless' assets should be valued at liquidation value. Thus, Payless was solvent until on or before May 13, 2001, and insolvent thereafter.

## FACTUAL BACKGROUND

This is the second Chapter 11 bankruptcy filing for this debtor. On July 21, 1997, Payless filed its first Chapter 11 case. It emerged pursuant to a Plan of Reorganization confirmed on November 19, 1997. One year after confirmation, Payless was operating 161 stores. By November 30, 2000, Payless was operating 150 stores.

When Payless emerged from its first bankruptcy it implemented new corporate goals. The corporate goal Payless considered most critical involved a decision to shift a greater percentage of its business from the do-it-yourself customer to the professional builder. In the fall of 2000 Payless retained Anderson Consulting to review its progress toward achieving its corporate goals. At the time of the consult, Payless' business was split almost equally between the two categories, and it hoped to increase the professional side to approximately 60 percent of the total. As part of its review, Anderson Consulting suggested the company retain Peter J. Solomon Company (Solomon), an investment banking firm. Solomon advised the company that its financial structure was sound, but that the company would be stronger if it closed approximately 24 stores and five distribution centers that were not performing well. By February 24, 2001, Payless was operating 133 stores.

Anders J. Maxwell, an investment advisor for Solomon stated in his deposition that during the fiscal year ending November 25, 1999, Payless showed Earnings Before Interest, Taxes, Depreciation, and

Amortization (EBITDA) of $62.8 million. For the fiscal year ending November 25, 2000, Payless showed EBITDA of $67.6 million. This represented the tenth consecutive quarter in which EBITDA increased. In 2000 Payless lost approximately $3.973 million before taxes, and $652,000 after taxes. In the prior year, however, the after-tax loss had been approximately $5.837 million. Moreover, net sales for fiscal year 2000 were the highest in four years. At that time Payless was the fourth largest seller of building materials in the nation. KPMG, as Payless' accountant, produced year-end financial statements for fiscal year 2000, in connection with Payless' 10–K filing with the Securities and Exchange Commission (The SEC). KPMG did not include a "going concern qualifier" in the financial statements. In order to prepare Payless' quarterly form 10–Q for the SEC for the quarter ending February 24, 2001, KPMG conducted a review(as opposed to a yearly audit) of the company's books, and again did not include a "going concern qualifier" in its report.

Based, however, upon both the reduction in the number of its stores and difficult conditions in the industry related to deflation in the price of lumber, at its February 21, 2001, Board meeting, Payless projected a decrease in EBITDA for fiscal year 2001 to approximately $52.4 million.

Despite these more conservative projections, during the first quarter of fiscal year 2001, which ended on February 24, 2001, Payless showed net income of $279,000, compared to a 2000 first quarter loss in the amount of $4,218,000. Millard Barron, the Chief Executive Officer of Payless, stated in his deposition that this was the company's best performance since 1994.

Mr. Barron also stated that by the end of fiscal year 2000, management believed it had made tremendous progress in re-engineering the company's business and profit models, as reflected in the significant improvement in the bottom line. Nevertheless, according to Mr. Barron, management continued to be aware that the company was highly leveraged, thus making it particularly susceptible to external factors.

At the end of the first quarter 2001, Payless issued a press release stating that it had reduced its overhead, and was making "significant progress toward (its) goal of profitability in 2001." Likewise, at the end of the first quarter, Payless showed total stockholders' equity in the amount of $134,693,000, based on fresh-start accounting.

In years past, Payless had received an overline advance from its lenders in January, during its slow season, to enable it to purchase inventory in anticipation of the increase in business during the spring selling season. In early January 2001, Payless' inventory lender, Congress Financial Corporation (Congress) notified Payless that, due to a disagreement among some of the participants in the inventory loan, the overline would not be made available. Congress advised Payless that one of the participants had suffered significant losses when another retailer filed for bankruptcy protection, and that it did not wish to continue to make retail overline loans. As a result, Payless had to find another overline lender. Hilco Capital, L.P., (Hilco) made an overline loan in the amount of $15 million to Payless on January 31, 2001. The overline loan was junior in priority to the existing Congress loan. While waiting for its overline loan, Payless was unable to purchase as much inventory as it planned, and in order to purchase critical inventory, it was forced to stretch payments to its vendors. Partially as a result, while Payless owned inventory on February 28, 2001, that it valued at cost in the amount of $291.4 million, by May 31, 2001, the cost

value of Payless' inventory had dropped to $218.81 million. The average per store inventory balance dropped from $2.49 million in May of 2000 to $1.89 million in May of 2001. And this decreased value assigned to inventory was even more damaging to Payless because the increase in lumber prices in late April and early May meant that Payless had even less inventory to offer customers with a cost value of $1.89 million than it would have had in February of 2001 at the same cost value.

When Payless emerged from its first bankruptcy filing, its trade vendors continued to do business with it, but demanded payment within 15 to 20 days of invoice. Payless adhered to that schedule through 2000. At least in part due to the delay in obtaining the overline loan, Payless began to stretch payments to its trade vendors by holding checks that its computers generated on the date each such payment was due to be paid. By the end of February, Payless had stretched its average payment to approximately 28.78 days, and was holding checks totaling $29.4 million. By the end of May, Payless had stretched average payment to 34.28 days, and was holding checks totaling $46.63 million.

According to Mr. Barron, the spring of 2001 was a difficult time for the entire industry. Lumber prices were deflated, and the country was emerging from a very severe winter. Nonetheless, by the end of the first quarter, on February 24, 2001, 90 percent of Payless' vendors continued to ship goods on credit despite the longer payment terms. By the end of the second quarter, on May 26, 2001, however, less than 5 percent of the vendors were shipping to Payless on credit.

On March 17, 2001, Payless still had available credit of $6,896,000 from Hilco.

Nonetheless, Mr. Barron stated that in April and May of 2001, Hilco tightened its lending formula. Despite the tightened formula and the decreasing inventory reserves, however, Payless had $22 million in sales the last week of April 2001. Thereafter, Hilco continued to tighten its formula, so that Payless was unable to use the cash generated by such sales to purchase fresh inventory. As a result, the weekly sales dropped to $17 million for the first two weeks of May, and to $16 million for the last two weeks of May. Despite approximately $68 million in sales in May 2001, Payless spent just $31 million to replenish its inventory, with Congress and Hilco capturing much of the balance.

Michael J. Egan, an owner of Hilco, stated in his deposition that by April 23, 2001, Payless had overdrawn its overline in the amount of $2.451 million and was in violation of certain covenants in its loan agreement with both Hilco and Congress. Egan also stated that from April 23, 2001, until June 4, 2001, Payless was generally overdrawn on its line of credit with Hilco. Hilco continued to tighten its credit terms, but also continued to make advances. On February 9, 2001, Hilco had been advancing at 71.3 percent of the lower of cost of the inventory, or market value. Hilco dropped that rate to 69 percent sometime in March. On a tax basis, Payless lost $55.655 million through the quarter ending May 26, 2001,[1] of which approximately $40 million represented one-time costs related to the closing of stores.[2]

In his deposition Anders Maxwell stated that Solomon was not in favor of Payless filing another Chapter 11 bankruptcy petition because it believed Payless was worth much more outside of bankruptcy. Solomon also predicted that a bankruptcy filing would precipitate a sales drop in the range

---

**1.** Def. Ex. # 32.

**2.** *Id.* at n. 5.

of 20–30 percent. Solomon further projected that, if Payless did not file for bankruptcy relief, it would be able to reduce its accounts payable, which totaled $69 million in April of 2001, to $50 million by November. By the end of the second quarter, on May 26, 2001, Payless' accounts payable stood at approximately $57 million.

According to Mr. Barron, on May 13, 2001, at an emergency meeting, Hilco suggested that Payless file a Chapter 11 bankruptcy petition in order to use its cash to purchase new inventory rather than to pay vendors for merchandise that had already been shipped. Hilco pointed out that, while Payless had had a couple of good weeks in April, it was now out of stock in key commodity areas, just as the weather was starting to warm up and the main selling season was about to begin. Prior to that time, Mr. Barron stated that management believed that, with the cooperation of its secured lenders, Payless could maintain the support of its vendors, continue to operate, and protect its value for shareholders.

In late April and early May, the price of lumber, which had been at record low prices, increased dramatically, further exacerbating Payless' out-of-stock difficulties. Payless' overall in-stock level fell from 89 percent in February to 69 percent by the first week in June.

In the period immediately following the May 13, 2001, emergency meeting, Payless was unable to agree with Congress and Hilco on terms for restructuring its debt either in or out of bankruptcy. On June 4, 2001, Payless filed for Chapter 11 relief. Despite ongoing negotiations, Congress/Hilco would not agree, prepetition, to provide debtor-in-possession (DIP) financing for Payless unless it, among other conditions, was given a priming first lien on all of Payless' assets. Thus, Payless filed this Chapter 11 petition without a DIP facility. Mr. Barron stated that without DIP financing, after the filing, approximately 268 vendors refused to ship goods to the company. Congress/Hilco eventually agreed to become the DIP financier, but the financing was not put into place until on or after July 19,2001, more than six weeks after Payless had filed for relief.

As predicted by Solomon, the filing of the bankruptcy was devastating to the customer base, particularly the professional builders who needed assurance that goods they ordered from the company would be available when they needed them for their jobs. Mr. Witaszak estimated that the bankruptcy filing caused Payless to lose approximately 20–30 percent of its customer base.

As pointed out by one of the Defendants expert witnesses, Mr. Guy Davis, Payless had substantial equity in its real estate, an unusual circumstance for a retailer in Chapter 11. Schedule "A" filed July 13, 2001, 2001, in the bankruptcy case, lists the fair market value of Payless' real estate as follows: (1) Land and improvements to land: $69,562,700; (2) Buildings: $108,129,557; and (3) Real Estate held for sale: $53,761,490. The real estate was encumbered by liens held by LaSalle Bank National Association as Trustee for Fortress Commercial Mortgage Trust (Fortress), with a claim in the amount of $53,600,000 and Canadian Imperial Bank of Commerce (CIBC), with a claim in the amount of $106,050,000. The expert witnesses relied upon by both Silverman and the Defendants also valued Payless' real estate substantially in excess of the real estate liens throughout the preference period.

By late August, Congress/Hilco, as the DIP lender, concluded that Payless would have to be liquidated. And on September 10, 2001, the United States Trustee ap-

pointed Silverman as the liquidating trustee.

Silverman filed a number of adversaries to avoid alleged preferential transfers. Several Defendants raised solvency as an affirmative defense. On October 22, 2002, this Court bifurcated the issue of solvency and consolidated the remaining Defendants in these two adversaries to make a solvency determination. As to the remaining five Defendants, Silverman alleges that transfers in the following amounts were made after March 6, 2001:(1) Hitachi Power Tools U.S.A., Ltd.: $1,258,377.89; (2) The Valspar Corporation: $842,088.40; (3) The Scotts Company: $624,731.16; (4) Crane Plumbing Corporation: $383,064.68; and (5) Osram Sylvania: $697,177.51. Commencing on February 24, 2003, this Court conducted a three day trial on the issue of solvency. Silverman called as an expert witness Louis G. Dudney, a principal with AlixPartners, L.L.C. Defendants called as expert witnesses (1) Guy A. Davis, a managing director of Navigant Consulting, Inc. and (2) Brooks Dean Myhran, a managing director and member of Goldsmith, Agio, Helms & Lynner, L.L.C. I will first deal with a motion to dismiss the Complaint, pursuant to section 550(a) of the Code, filed by the Defendants. I will then limit my analysis in these bifurcated adversaries to the issues of whether Payless was solvent on March 6, 2001, and, if so, at what point Payless became insolvent.

## DISCUSSION

### 11 U.S.C. § 550(a)

■ In their pre-trial brief, Defendants ask this Court to find in their favor on the grounds that any recovery will only go to satisfy administrative claims, and not prepetition unsecured claims. Silverman and Defendants stipulate to the following facts: (1) Silverman has identified approximately 2000 potential preference claims with an aggregate gross recovery of $105,573,964; (2) approximately 1200 of these claims are for less than $10,000; (3) Silverman will proceed by demand letter for claims of less than $10,000; (4) administrative claims in the estate total approximately $17.5 million; (5) Silverman will incur an additional $2 million in legal fees and costs to pursue the remaining preference actions; (6) Congress has a lien on preference recoveries in the amount of $273,566.80; (7) Silverman cannot estimate the net recovery from preference litigation; and (8) without preference recoveries, the estate may be administratively insolvent.

Section 550(a) of the Code allows the trustee to bring an alleged preference action for the benefit of the estate:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section ... 547 ... of this title, *the trustee may recover, for the benefit of the estate,* the property transferred, or, if the court so orders, the value of such property ... [3]

Defendants argue that a trustee is not authorized to bring a preference cause of action to recover funds from some unsecured creditors unless the recovery will go to satisfy claims of all unsecured creditors. Here, the Defendants argue that any recovery will go to satisfy administrative claims, and that it is unlikely the recoveries will be sufficient to pay any dividend to unsecured creditors. Defendants rely upon *Harstad v. First American Bank (In re Harstad).*[4] In *Harstad* the court found that a trustee could not bring a preference action if the recovery would only benefit

---

**3.** 11 U.S.C. § 550(a) (emphasis added).

**4.** 39 F.3d 898 (8th Cir.1994).

the debtor, not any creditors of the estate.[5] That is not the case here. It is true that any recovery will first go to satisfy administrative expenses, but the payment of such expenses does benefit the estate, and not just the debtor. As such, based on the stipulation filed February 25, 2003, and my reading of *Harstad,* I find that section 550(a) of the Code does not bar Silverman from bringing these adversary proceedings. I will, therefore, enter an Order denying Defendants' request.

### 11 U.S.C. § 547(b)(3)

 Silverman filed these adversary proceedings to avoid alleged preferential transfers Payless made to the above Defendants. Silverman contends that Payless transferred funds to the Defendants within 90 days of filing its bankruptcy petition, that it was insolvent at the time of the transfers, and that it made the transfers to pay antecedent debts. Section 547(b) of the Bankruptcy Code (the Code) authorizes the trustee to avoid such transfers:

> (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
>
> > (1) to or for the benefit of a creditor;
> >
> > (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> >
> > (3) made while the debtor was insolvent;
> >
> > (4) made—

(A) on or within 90 days before the date of the filing of the petition;

> . . . . .

> (5) that enables such creditor to receive more than such creditor would receive if—
>
> > (A) the case were a case under chapter 7 of this title;
> >
> > (B) the transfer had not been made; and
> >
> > (C) such creditor received payment of such debt to the extent provided by the provisions of this title.[6]

Moreover, there is a presumption that debtors are insolvent within 90 days of filing for bankruptcy relief:

> (f) For the purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition.[7]

Because of the presumption of insolvency, the burden of proof is on the defendant to rebut the presumption.[8] If the defendant, however, presents sufficient evidence of solvency, then the burden of persuasion shifts to the trustee to prove the debtor was insolvent on the relevant date.[9] Silverman moved for a judgment in its favor at the conclusion of the Defendants' case, claiming that the Defendants failed to rebut the presumption of insolvency. I denied that motion. I found that the Defendants had made a prima facie case that Payless was a going concern for all or part of the preference period. Defendants presented evidence that Payless was open and doing business at all times prior to the bankruptcy filing. Mr. Witaszak testified,

---

5. *Id.* at 903.

6. 11 U.S.C. § 547(b).

7. 11 U.S.C. § 547(f).

8. *Jones Truck Lines, Inc. v. Full Service Leasing Corp. (In re Jones Truck Lines, Inc.),* 83 F.3d 253, 258 (8th Cir.1996).

9. *Lids Corp. v. Marathon Investment Partners, L.P. (In re Lids Corp.),* 281 B.R. 535, 540 (Bankr.D.Del.2002).

on behalf of management, that management believed its business plan was working and sales would improve. For most of the preference period Payless continued to obtain advances from its secured creditors. Payless was not in default with Congress or Hilco until April 23, 2001. In the Eighth Circuit a financial statement showing positive net worth at the beginning of the preference period is sufficient to rebut the presumption of insolvency.[10] Payless' Form 10–Q, which it filed with the Securities and Exchange Commission for the period ending on February 24, 2001, showed total stockholders equity in the amount of $134, 693,000.[11] For these reasons, I found that the Defendants had rebutted the presumption of insolvency, and I, therefore, denied Silverman's motion for judgment at the conclusion of defendant's evidence. As a consequence, the burden of proof shifted to the trustee to prove insolvency as of the date of each challenged transfer.

Payless filed its bankruptcy petition on June 4, 2001. The preference period, therefore, began on March 6, 2001. Mr. Davis, Defendants' expert, testified that Payless was a going concern for all of the preference period, and that it was solvent for all of the preference period. Mr. Davis valued Payless' assets using both an individual asset valuation and a Comparable Company Approach. Since he found Payless to be a going concern throughout the preference period, Mr. Davis did not perform a valuation of Payless' assets using liquidation value. Mr. Dudney, Silverman's expert, testified that Payless was insolvent for all of the preference period using either going concern value or liquidation value. Mr. Dudney also used an individual asset valuation and a Comparable Company Approach. Both experts testified that Payless used "fresh-start" accounting beginning in 1997 when Payless emerged from bankruptcy the first time. Fresh-start accounting is the accounting method that a debtor adopts upon emergence from bankruptcy provided it can meet three criteria: (1) the debtor filed a Chapter 11 bankruptcy petition; (2) the debtor's reorganization value was less than allowed claims plus post-petition debt; and (3) preconfirmation shareholders received less than 50 percent of the voting shares of the reorganized company.[12] These criteria imply "that the company is a new entity with new owners and should be accounted for in a similar way to a purchase transaction."[13] Thus, the new entity's balance sheet is reconstituted from a historical-cost basis to a new fair-market-value basis.[14] The American Institute of Certified Public Accountants' Statement of Position 90–7, *Financial Reporting by Entities in Reorganization Under the Bankruptcy Code*, requires firms that meet the above criteria to restate their assets and liabilities at their going-concern values.[15] Under fresh-start accounting reorganization value in excess of amounts allocable to identifiable assets is captioned as goodwill on a debtor's balance sheet.[16] Both Mr. Davis and Mr. Dudney testified that they used fresh-

---

10. *Jones Truck Lines,* 83 F.3d at 258..

11. Def. Ex. # 2.

12. James Horgan, *Reporting the Post–Restructuring Balance Sheet, It's Not Always What You Would Expect,* 21 Am. Bankr.J. 8, 8 (2002).

13. *Id.*

14. *Id.*

15. Stuart C. Gilson, Edith Hotchkiss, and Richard S. Ruback, *Valuation of Bankrupt Firms,* 787 PLI/COMM 467, 482 (1999).

16. James M. Lukenda, *New Rules for Business Combinations, Intangibles and Goodwill Accounting,* 20 Am. Bankr.J. 20, 20 (2002).

start accounting in making their individual asset valuations, and that they allocated no value for goodwill.

██ Both experts in this case defended their methodology and testified extensively regarding the Comparable Company Approach, which I will address later. I read section 101(32) of the Code, however, to mean that solvency or insolvency in preference litigation is to be determined primarily by use of the balance-sheet.[17] The Code defines insolvency as "a financial condition such that the sum of such entity's debts is greater than all of such entity's property at fair valuation."[18] As the Honorable Richard A. Posner stated, a "firm could be solvent in balance-sheet terms yet be in danger of imminent failure. Bankruptcy law ignores these subtleties in the interest of having a clear rule: balance-sheet solvency determines whether the payments to creditors ... are voidable preferences."[19] Thus, I will use a balance-sheet test, based on the assets at fair valuation, to determine if Payless was insolvent during the preference period.[20] Fair valuation is "generally defined as the going concern or fair market price '[u]nless a business is on its deathbed.' "[21] If, however, a company is "on its deathbed," assets should be valued on a liquidation basis.[22] In its Summary of Schedules filed on July 13, 2001, Payless listed total assets of $511,040,885 and total liabilities of $415,108,191.[23] Payless valued its assets at their going concern value in preparing its bankruptcy schedules. Mr. Dudney, Silverman's expert witness, conceded at the hearing that, as a going concern, Payless was solvent on March 6, 2001. Mr. Davis and Mr. Myhran offered testimony as to the value of Payless' assets as a going concern, but they offered no opinion of the value of the assets at liquidation value. Mr. Dudney, on the other hand, found that Payless was insolvent on March 6, 2001, and at all times thereafter, if the assets are valued at liquidation value. Therefore, whenever Payless ceased to be a going concern, I must use Mr. Dudney's liquidation values and find that Payless was insolvent on that date. Thus, I begin with a determination of whether Payless was a going concern on March 6, 2001, and if so, at what point it ceased to be a going concern.

In this case, the difference between whether Payless was solvent during the preference period depends entirely on whether Payless' inventory is valued at going concern or liquidation value. While both experts assign slightly different numbers to Payless' assets at the beginning of the preference period, those variances do not make a significant difference. And both experts agree that the inventory is the only asset significantly impacted by the valuation methodology utilized. As the chart below demonstrates, Payless was solvent on March 6, 2001, if its inventory is valued at cost, and it was insolvent on March 6, 2001, if its inventory is valued at

---

**17.** *In re Taxman Clothing Co.,* 905 F.2d 166, 169 (7th Cir.1990).

**18.** 11 U.S.C. § 101(32)(A). *See also Lids Corp. v. Marathon Investment Partners, L.P. (In re Lids Corp.),* 281 B.R. 535, 540 (Bankr. D.Del.2002).

**19.** 905 F.2d at 169.

**20.** *Miller & Rhoads, Inc. Secured Creditors' Trust v. Robert Abbey, Inc. (In re Miller &* *Rhoads, Inc. Secured Creditors' Trust),* 146 B.R. 950, 955 (Bankr.E.D.Va.1992).

**21.** *Id.* (quoting *Utility Stationery Stores, Inc. v. Southworth Co. (In re Utility Stationery Stores, Inc.),* 12 B.R. 170, 176 (Bankr.N.D.Ill.1981)).

**22.** *Id.*

**23.** Def. Ex. # 55.

liquidation value, or 76.5 of cost. There is some discrepancy in the values assigned to assets other than inventory because Mr. Davis began his analysis on March 6, 2001, and Mr. Dudney began his analysis on February 24, 2001. For purposes of this determination, I will assume the value of the inventory on February 24, 2001, to approximate the value of the inventory ten days later. Below is a comparative chart of the values in thousands at the beginning of the preference period:

| March 6, 2001 | FAIR VALUE | | LIQUIDATION VALUE [24] | |
| --- | --- | --- | --- | --- |
| | Davis | Dudney | Davis | Dudney |
| **ASSETS:** | | | | |
| Cash | $ 843 | 843 | | 843 |
| Inventory—104 stores | 273,330 | 291,406 | | 222,926 [25] |
| Inventory—Closing locations | 6,327 [26] | | | |
| Accounts Receivable | 6,536 | 9,010 | | 6,523 |
| Prepaids | 1,817 | 10,847 | | 5,424 [27] |
| Benefit plans | 288 | | | |
| Deposits and Notes Receivables | 226 | | | |
| Land and Buildings | 250,038 | 221,948 | | 237,821 |
| Furniture and Fixtures | 11,412 | 28,395 | | 2,004 |
| Equipment and computers | 13,739 | 38,568 | | 901 |
| Automobiles | 5,377 | 6,721 | | 10,275 |
| Construction in Progress | | 1,946 | | |
| Other | | 4 | | |
| **TOTAL ASSETS** | $569,934 | $609,118 [28] | | $487,098 |
| **LIABILITIES:** [29] | | | | |
| Total Liabilities: | $504,425 | 504,425 | | |
| Projected Net Loss | 904 | 477 | | |
| Reversal of bad debt reserve | | (2,244) | | |
| Closing costs for 29 stores | 4,100 | | | |
| Other closing costs | 25,200 | | | |

**24.** Def. Ex. ## 43A and 45.

**25.** Mr. Dudney used 76.5 percent of realization for liquidation value as to the inventory in 137 stores.

**26.** Mr. Davis figured on a 35 percent realization of inventory from the 29 stores slated for closure. I note that had Mr. Davis used a 76.5 realization for those stores, there would be no discrepancy in the value of the inventory. Mr. Dudney's cost value for the inventory is $291,406,000 and Mr. Davis' cost value for the inventory is $279,657,000.

**27.** Mr. Dudney estimated a 50 percent realization.

**28.** Mr. Dudney calculated total assets according to the balance sheet to be $639,118,000 as of February 24, 2001. The correct calculation is $609,118,000.

**29.** Despite some debate as to how to value assets, liabilities are valued at their face value. *Lids Corp. v. Marathon Investment, Partners, L.P. (In re Lids Corp.)*, 281 B.R. 535, 545 (Bankr.D.Del.2002). Therefore, when valuing individual assets, or conducting a balance sheet analysis of solvency, the fair market value of the assets is compared to the face value of the liabilities. *Id.*

| | | |
|---|---|---|
| Selling expenses | 5,699 [30] | |
| Closing costs for 137 stores | | 61,700 [31] |
| Reversal of prior year store closing | (1,300) | |
| | | |
| TOTAL LIABILITIES | $539,029 | $563,058 |

Thus, according to both experts, using an individual asset analysis, Payless was solvent as a going concern on March 6, 2001. Having listened to the testimony of all three experts and studied their various reports, I will adopt the individual asset values in the report of Guy A. Davis as to Payless' going concern value. And, since Mr. Davis did not perform a liquidation analysis, I will adopt the individual asset values in Mr. Dudney's report as to Payless liquidation value.

Both experts relied upon the Comparable Company Approach (sometimes called the EBITDA Multiple Approach) as a widely accepted method of valuing the equity of a company. The Comparable Company Approach uses the market valuations and transactions of comparable companies in the same industry. According to Mr. Davis, the theory behind this approach "endorses the concept that the cash generated from assets employed by *Company A* in a particular industry is going to be valued on a consistent basis by potential investors as the cash flow generated from assets employed by *Company B* in the same industry." [32] In other words, Mr. Davis looked at Payless' EBITDA for the trailing twelve months. He then developed industry multiples using both market and transaction information from what he considered nine comparable companies. He averaged the multiples, adjusted upward for the premium purchasers will pay for a controlling interest, and downward for Payless' relative position versus the industry. He arrived at a multiple of 6.1. Mr. Davis testified that Payless' EBITDA from February 24, 2000, through February 24, 2001, multiplied by the market multiple of 6.1, after deducting interest-bearing debt demonstrated equity before adjustments of $80.7 million. This represents the going concern value of Payless' 104 profitable stores. Mr. Davis made further adjustments for liquidating the 29 unprofitable stores and determined that the going concern value of Payless was $71.377 on March 6, 2001.[33] Mr. Dudney challenged Mr. Davis' methodology and performed a similar calculation using different comparable companies and the harmonic mean instead of an average in order to determine the multiples. Not surprisingly, Mr. Dudney found that Payless' equity value was negative $15.9 million on March 6, 2001. For the following reasons, I will adopt Mr. Davis' report. Payless had had positive EBITDA for the previous ten quarters.[34] Both Mr. Davis and Mr.

---

30. Mr. Davis estimates selling expenses of one percent of asset value.

31. Mr. Dudney used liquidation values throughout and estimated the costs of closing 137 stores. Mr. Davis, on the other hand, estimated the cost of closing 29 stores. Mr. Dudney conceded at the hearing, however, that it would be inappropriate to factor in the cost of closing 137 stores if making a going concern valuation.

32. Def. Ex. # 43 at pg. 6.

33. Def. Ex. # 43F.

34. According to Trustee's Ex. # 31 (Form 10–Q), Payless had net sales of $232,885,000 for the quarter ending February 24, 2001. The cost of merchandise sold was $166,952,000 leaving a gross profit of $65,933,000. After subtracting selling, general, and administrative expenses of $62.339 from gross profit, and adding other income of $342,000, I find that Payless' EBITDA for the first quarter of 2001 was $3,936,000.

Myhran testified that the harmonic mean is an inappropriate methodology for determining market multiples. I found their testimony credible. I find that Mr. Davis convincingly defended his choice of comparable companies. And finally, I find that Mr. Davis' conservative individual asset valuation on a going concern basis indicates positive equity. Both experts testified that fresh-start accounting removes goodwill from the equation when valuing a company emerging from bankruptcy. Both experts also testified that an EBITDA analysis is used to take advantage of the synergy created by a going concern. In other words, an EBITDA analysis, provided the correct multiples are used, should result in a higher valuation than an individual asset valuation. That was the case for Mr. Davis' Comparable Company Approach, but not for Mr. Dudney's.[35] For that reason, and based on my evaluation of the expert witnesses, their education and experience, and also because, as noted, there were some mathematical errors in Mr. Dudney's report, I will adopt Mr. Davis' report for the Comparable Company Approach.

■■■■ The real issue, however, is whether Payless was a going concern or on its deathbed during the preference period. A commercial enterprise is a going concern if it is actively engaged in business with the expectation of indefinite continuance.[36] Mr. Davis found the following facts relevant in making his determination that Payless was a going concern: (1) Payless had 137 stores open and operating, 104 of which it believed could be made profitable; (2) Payless had an active workforce of approximately 7000 people; (3) Payless still had lenders willing to continue advancing money on a daily basis; (4) Payless had equity shares actively being traded on the open market; (5) Payless received a clean audit opinion from its auditors on February 24, 2001, with no going concern qualifier; (6) Payless had issued projections for both positive EBITDA and net income for 2001; (7) Payless' management was optimistic about its future; and (8) Payless had vendor loyalty and support.[37] In *Jones Truck Lines, Inc. v. Full Service Leasing Corporation (In re Jones Truck Lines, Inc.)*,[38] the Eighth Circuit suggested the following factors as evidence of a going concern: (1) whether the company was operating; (2) whether the officers were optimistic; and (3) whether the managers and lenders continued to invest in the business.[39] Using these factors, the Eighth Circuit found that the debtor in that case, though financially troubled, was still a going concern at the beginning of the preference period.[40] In *In re Taxman*,[41] the Seventh Circuit began its analysis of solvency with a discussion of the purpose of section 547(b). The court suggested that the Code emphasized a company's solvency because "once a firm is in acute peril the temptation to try to keep afloat in the hope its luck will change may lead it to strike a deal with its key creditors to the prejudice of its other credi-

---

**35.** Using a Comparable Company Approach, Mr. Dudney found that Payless had a negative value of $16.232 million on March 6, 2001. However, during his testimony, he conceded that had he used the proper costs of closing 29 stores instead of 137 stores, under his individual asset analysis, Payless was solvent on March 6, 2001.

**36.** Black's Law Dictionary 278 (Bryan A. Garner, ed.1996).

**37.** Def. Ex. # 43 at pgs. 4–6.

**38.** 83 F.3d 253 (8th Cir.1996).

**39.** *Id.* at 258

**40.** *Id.*

**41.** 905 F.2d 166 (7th Cir.1990).

tors." [42] Thus, the knowledge that undue pressure may precipitate a bankruptcy filing and that any payments made may be subject to avoidance may cause other creditors to "be more forbearing, and by doing so makes it less likely that firms will be pushed into bankruptcy prematurely." [43] Judge Posner uses the term "point of peril" in lieu of "deathbed." He defines the "point of peril" as the time when a company's ability to continue as a going concern is in doubt because its expected revenues are less than the expected costs. [44] Thus, the Seventh Circuit in *Taxman* found that the debtor was not on its deathbed during the preference period because "the assets that it could realize on in the ordinary course of its business exceeded the expenses of realizing on them, plus its other liabilities." [45] Under his definition, as long as a company is operating, showing positive EBITDA, and its creditors and stockholders are continuing to invest in it, it is a going concern. Silverman argues, however, that solvency is not determined by either the debtor's conduct or the conduct of third parties. [46] It claims that a company is not solvent just because other parties believe it is solvent. Silverman relies on the facts that Payless' management missed projections for all of 2001 and that Payless was forced to liquidate within three months of its bankruptcy filing as proof that Payless was on its "deathbed" during the preference period. Those are relevant facts, but they are not sole determinants of solvency. It is undisputed that Payless continued to operate throughout the pref-

erence period. Moreover, both Edward Zimmerlin, Payless' former Senior Vice President of Marketing and Merchandising, and Richard Witaszak, testified that they believed the company would be successful, and that they both bought stock in the company. Mr. Witaszak testified that he continued to buy stock throughout the first quarter of 2001. Payless showed positive EBITDA for ten consecutive quarters, and had positive EBITDA at the beginning of the preference period.

In *Lids Corporation v. Marathon Investment Partners, L.P. (In re Lids Corporation),* [47] the court held that as long as liquidation in bankruptcy is not clearly imminent on the date of the transfer, a company should be valued as a going concern. [48] As a going concern a company's assets should be measured at market value rather than at distress value. [49] Or, as the court in *Lids Corporation* stated, "assets should be valued at the sale price a willing and prudent seller would accept from a willing and prudent buyer if the assets were offered in a fair market for a reasonable period of time." [50] The debtor in *Miller & Rhoads, Inc. Secured Creditors Trust v. Robert Abbey, Inc. (In re Miller & Rhoads, Inc. Secured Creditors Trust),* [51] was losing money in every store on a operating basis when it filed for bankruptcy protection. Inventory levels, sales levels, gross profit margins, operating expenses, sales per square foot and capital expenditures were all below industry average. On the date Miller & Rhoads filed for bankruptcy relief it had suffered net

---

42. *Id.* at 168.

43. *Id.*

44. *Id.*

45. *Id.*

46. *Lids,* 281 B.R. at 535.

47. 281 B.R. 535 (Bankr.D.Del.2002).

48. *Id.* at 541.

49. *Id.*

50. *Id.*

51. 146 B.R. 950 (Bankr.E.D.Va.1992).

losses of $14.7 million for fiscal year 1989, and there was negative shareholders' equity of $16.5 million.[52] Unlike Payless, Miller & Rhoads only showed positive EBITDA one month in the year prior to its bankruptcy filing.[53] In addition, on the date Miller & Rhoads filed its Chapter 11 bankruptcy petition the court found that by valuing its assets using a liquidation standard, its liabilities exceeded its assets by $20,792,592,90.[54] The court, thus, found that Miller & Rhoads was not solvent on the transfer dates.

■ I, however, find the facts in *Taxman* more on point to the facts of this case. In *In re Taxman Clothing Company, Inc.*,[55] the debtor closed its doors five days before filing for bankruptcy relief.[56] It later sold its inventory at an auction. In subsequent preference litigation, the bankruptcy court used the price the inventory brought at auction to value the inventory on the date of the alleged preferential transfer.[57] The district court affirmed, but the Seventh Circuit reversed. It found that, while the debtor closed its doors five days prior to filing for bankruptcy relief, 90 days before the filing it was open and doing business. It further found that debtor continued to sell clothing in its customary manner, even though it was being pressed for payment by its trade creditors.[58] The court stated that a company is not on its deathbed if "the assets that it could realize on in the ordinary course of its business exceeded the expenses of realizing on them, plus its (other) liabilities."[59] Using this objective definition I find that Payless was a going concern as long as it sold inventory at a rate to cover the costs of those sales. Payless had positive EBITDA for the quarter ending February 24, 2001. At some point during the quarter ending on May 26, 2001, however, Payless ceased to cover its costs. The Form 10–Q for the quarter ending May 26, 2001, indicates that Payless had negative EBITDA for that quarter.[60] Payless had gross profit of $43,589 million. After deducting selling, general, and administrative expenses of $64.940 million, and adding other income of $453,000, Payless had EBIDTA of negative $20.898 million.[61] But there is no evidence that Payless' EBITDA was negative throughout the quarter. Silverman offered no weekly or monthly financials to allow this Court to determine the exact time that Payless' EBITDA turned negative. I, thus, must look to other evidence that was presented. The last week of April Payless' sales were $22 million. Payless' total sales for the month of May were $68 million, but Congress/Hilco permitted Payless to use only $31 million to purchase inventory. In late April Payless defaulted on its loan from Congress. Nevertheless, the inventory lenders continued to make advances, albeit at reduced levels. On May 13, 2001, management and Congress/Hilco held an emergency meeting. At that meeting Congress/Hilco made further funding contingent upon Payless' filing for Chapter 11 bankruptcy relief. By that time Congress/Hilco had tightened credit terms such that less than one-half of the funds from net sales was going to

**52.** *Id.* at 954.

**53.** *Id.*

**54.** *Id.*

**55.** 905 F.2d 166 (7th Cir.1990).

**56.** *Id.* at 167.

**57.** *Id.* at 168.

**58.** *Id.*

**59.** *Taxman,* 905 F.2d at 169.

**60.** Trustee's Ex. # 32.

**61.** *Id.*

replace inventory. As a result, Payless could not stock its stores during the month of May, the beginning of Payless' optimum selling season. At the same time, lumber prices were increasing, so even if Payless had additional cash to make purchases, it was receiving less inventory in the exchange. In addition, the decision to file for bankruptcy, as predicted by Solomon, reduced Payless' customer base by 25–30 percent. Finally, as a result of the decision to file another bankruptcy petition, without a DIP facility, few of Payless' trade vendors were willing to extend credit to Payless on any terms. Thus, the coalescence of these four factors—tightened credit; insufficient inventory; no DIP facility; and unavailable trade credit-put Payless to bed, and there was no realistic hope for recovery. And I find that those four factors coalesced on May 13, 2001. Until that date, Payless was a going concern.[62]

▮ Silverman argues that Payless was on its deathbed for all of fiscal year 2001 because management's projections were inaccurate for all of that year, that the severe winter of 2000/2001 harmed sales, that lumber prices were deflated during the winter, and when they dropped Payless had little access to credit in order to replenish its supplies, that Payless was closing stores and had a declining sales base, that it reduced spending on advertising, thus further diminishing sales, that Payless was understocked, that Payless was holding checks and increasing payables, and that Payless decided to liquidate within three months of filing for bankruptcy relief. These factors must be balanced, however, against the facts that Payless continued to operate 104 stores, that it produced $22 million in sales for the last week of April of 2001[63] and $68 million in sales for the month of May; that projections for the year remained positive until late April, and that Payless continued to use its assets to cover the costs of its sales. As the court warned in *Taxman,* "caution should be taken not to consider property as 'dead' merely because hindsight teaches that the debtor was traveling on the road to financial ruin."[64] On the other hand, liquidation value is appropriate if, at the time of the transfer, the company is " 'so close to shutting its doors that a going concern standard is unrealistic.' "[65] Payless was a going concern on March 6, 2001. Only in hindsight can Silverman say that, in March, Payless was on the road to financial ruin and liquidation was inevitable. Nonetheless, on May 13, 2001, enough factors coalesced to create a situation where Payless either had to close its doors or file for bankruptcy relief. At that point, Payless ceased to be a going concern. I, therefore, find that Payless was a going concern, and solvent, until May 13, 2001. From then until June 4, 2001, Payless was insolvent.

An Order in accordance with this Memorandum Opinion will be entered this date.

62. This is not to say that either Congress or Hilco acted inappropriately. As shown, by May 13, 2001, Payless was in default on its obligation to both lenders. Although Congress and Hilco continued to advance for a short time after the default had occurred, they were under no obligation to do so.

63. According to Millard Barron, this was one of the highest weekly sales recorded within the previous 12 months.

64. *Id.*

65. *Gillman v. Scientific Research Products, Inc. of Delaware (In re Mama D'Angelo, Inc.),* 55 F.3d 552, 555 (10th Cir.1995) (quotations omitted).