In re HEILIG–MEYERS COMPANY, et al., Debtors.

Heilig–Meyers Company, et al., Plaintiffs,

v.

Wachovia Bank, N.A., f/k/a First Union National Bank and as successor by merger to Wachovia Bank, N.A., both as agent and individually; Wachovia Securities, Inc., f/k/a Wachovia Capital Markets, Inc.; Bank of America, N.A.; Crestar Bank; SunTrust Bank; The Fuji Bank, Ltd.; First Chicago, f/k/a The First National Bank of Chicago; Credit Lyonnais, New York Branch; The Bank of Tokyo–Mitsubishi, Ltd.; MLO CLO XIX Sterling (Cayman), Ltd.; PNC Bank, National Association; Prudential Insurance Company of America; Pruco Life Insurance Company; DOE Wachovia Certificate Holders Nos. 1–1,000; and DOE FUNB Certificate Holders Nos. 1–1,000, Defendants.

Bankruptcy Nos. 00–34533–DOT to 00–34538–DOT. Adversary No. 02–6158–DOT.

United States Bankruptcy Court, E.D. Virginia, Richmond Division.

Dec. 21, 2004.

448

Bruce H. Matson, Richmond, VA, for Debtors.

Scott L. Baena, Bilzin, Sumberg, Baena, Price & Axelrod LLP, Miami, FL, Special Counsel for Debtors.

Kevin R. Huennekens, Kutak, Rock LLP, Richmond, VA, for Wachovia Bank, N.A.

David D. Hopper, Cook, Heyward, Lee, Hopper & Feehan, P.C., Richmond, VA, for Prudential Insurance Company of America and Pruco Life Ins.

## REVISED MEMORANDUM OPINION

DOUGLAS O. TICE, JR., Chief Judge.

A trial over 10 days was held in November 2003 on plaintiff debtors' amended complaint to avoid allegedly preferential or fraudulent cash transfers and grants of liens made to defendants, a group of debtors' pre-petition secured creditors. The transfers at issue were made on May 25, 2000, as part of a major financial restructuring of the debtors. The issues for decision are (1) whether debtors were insolvent on a consolidated basis on May 25, 2000; (2) whether the defendant lenders were entitled to a new value defense with regard to the allegedly preferential cash transfers and liens; and (3) whether the lenders were entitled to an ordinary course of business defense with regard to the allegedly preferential cash transfers. Following the conclusion of the trial, the court took ruling under advisement. The parties have submitted voluminous post-trial proposed findings and memoranda of law.

For the reasons stated below the court holds that debtors were solvent on May 25, 2000, and the cash transfers and grants of liens were therefore neither preferential nor fraudulent. This ruling precludes the necessity for the court to considers defendants' affirmative defenses.

## PROCEDURAL HISTORY

On August 16, 2000, Heilig–Meyers Company and five of its wholly-owned subsidiaries filed their respective voluntary chapter 11 petitions. On the same date, the court entered an order authorizing the joint administration of the debtors' cases for procedural purposes only.

The official committee of unsecured creditors filed the initial complaint in this adversary proceeding on July 29, 2002, seeking the avoidance of cash transfers, liens, guaranties, and super-priority claims made or granted by debtors to the defendant lenders as a result of a restructuring on May 25, 2000. The committee filed an amended complaint on November 7, 2002. Through its amended complaint the committee sought:

    (a) avoidance of the cash transfers and liens made or granted to the lenders as preferential transfers;

    (b) avoidance of the cash transfers and liens made or granted to the lenders as fraudulent transfers;

(c) avoidance of the guaranties granted to the lenders as fraudulent transfers;

(d) avoidance of the replacement liens granted to the lenders pursuant to the terms of adequate protection orders filed in debtors' main bankruptcy case;

(e) disallowance of the super-priority claim granted to the lenders pursuant to the terms of adequate protection orders filed in debtors' main bankruptcy case;

(f) disgorgement of the avoidable cash transfers;

(g) disgorgement of professional fees from the lenders pursuant to the terms of adequate protection orders filed in debtors' main bankruptcy case;

(h) turnover of estate assets; and

(i) a judgment declaring the lenders' liens invalid and fixing the amount of the lenders' unsecured claims.

By order of the court dated December 18, 2002, debtors were substituted for the committee as plaintiffs in this adversary proceeding.

On July 23, 2003, debtors filed a motion for partial summary judgment as to the avoidability under 11 U.S.C. §§ 547, 550, and 551 of cash transfers and liens made and granted by debtors to the lenders as a result of the May 25, 2000, restructuring. On October 29, 2003, the court made a partial ruling on the summary judgment motion and entered an order denying summary judgment as to the cash transfers made by debtors to the lenders known as the Berrios proceeds.[1] On December 31, 2003, the court ruled on the other issues raised by debtors' summary judgment and entered an order adopting an opinion with findings submitted by the lenders. The court ruled that:

(1) $20,000,000 of liens transferred by debtor Furniture Company as a result of the debtors' May 25, 2000, restructuring were on account of antecedent debt;

(2) the benefits received by debtors as a result of the May 25, 2000, restructuring were not sufficient to establish the lenders' contemporaneous exchange for new value defense;

(3) the lenders were not entitled to an ordinary course of business defense with regard to the liens granted as a result of the May 25, 2000, restructuring because their securitization of previously unsecured debt was inconsistent with the parties' past practices; and

(4) debtors had withdrawn the portion of their motion for summary judgment regarding new value and ordinary course defenses to cash payments made on the lenders' revolving line of credit.

The lenders filed their own motion for summary judgment on September 25, 2003. They sought summary judgment as to the appropriate valuation standard to be used in the insolvency analysis of debtors and to establish that the lenders had provided sufficient evidence of debtors' solvency on May 25, 2000, to rebut the initial presumption of debtors' insolvency under 11 U.S.C. § 547(f).[2] Hearing was held October 10, 2003, and the court ruled from the bench that the motion was granted as to the lenders' having rebutted the initial presumption of insolvency, but the motion was denied as to determining the proper

---

**1.** The Berrios proceeds constituted the $99,000,000 in cash and $18,000,000 note receivable generated from the sale of substantially all of the assets and business operations of two of debtors' Puerto Rican subsidiaries. The court's ruling held that the cash transfer was outside the preference period.

**2.** Section 547(f) states that "for purposes of [§ 547], the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." 11 U.S.C. § 547(f).

valuation standard for the insolvency analysis. Accordingly, the court entered a memorandum opinion and order on December 9, 2003, granting in part and denying in part the lenders' motion for summary judgment.

The court's orders and opinions entered December 18, 2002, October 29, 2003, December 9, 2003, and December 31, 2003, are incorporated in this opinion.

Trial on the amended complaint was held November 3–7, 10, 13–14, and 17–18, 2003. At the conclusion of the trial the court took all issues under advisement. Based upon the court's rulings on the two motions for summary judgment, only three issues remained for trial: (1) whether debtors were insolvent on May 25, 2000; (2) whether the lenders were entitled to a new value defense with regard to the allegedly preferential cash transfers and liens; and (3) whether the lenders were entitled to an ordinary course of business defense with regard to the allegedly preferential cash transfers. Following trial, the parties filed post-trial memoranda of law and proposed findings of fact and conclusions of law and, later, reply memoranda of law.

## FINDINGS OF FACT

### Heilig–Meyers Company

Heilig–Meyers Company, a publicly-held Virginia corporation, is a retailer of home furnishings whose predecessors date back to 1913. The company has five subsidiaries including Heilig–Meyers Furniture Company, a North Carolina corporation; Heilig–Meyers Furniture West, Inc., an Arizona corporation; HMY Star, Inc., a Virginia corporation; HMY RoomStore, Inc., a Virginia corporation; and MacSaver Financial Services, Inc., a Delaware corporation.

Heilig–Meyers and its subsidiaries historically located stores in smaller towns and rural markets in the United States, tailoring their business to lower and middle income consumers. The majority of retail sales were made through the company's offering of installment credit programs, often to customers who typically did not qualify for credit elsewhere. This credit function was managed store-by-store, with each location being responsible for extending credit and collecting payments in accordance with general corporate guidelines. Uniquely, customers typically made their payments in person at their local stores, and the companies did not send bills or invoices to their customers.

Over the years Heilig–Meyers expanded broadly beyond its original base in Virginia and North Carolina through a series of acquisitions and by penetrating new markets. The corporate structure that evolved was comprised of publicly-held Heilig–Meyers as parent-holding company with other operating companies as wholly-owned subsidiaries. By 1998, the consolidated company had become the largest furniture retailer in the United States with more than 1,200 stores in thirty states and reported total annual revenues exceeding $2,000,000,000.

### The Lenders

The defendant lenders are a group of debtors' pre-petition secured creditors. The group is comprised of Wachovia Bank, N.A., f/k/a First Union National Bank and successor by merger to Wachovia Bank, N.A.; Wachovia Securities, Inc., f/k/a Wachovia Capital Markets, Inc.; Bank of America, N.A.; SunTrust Bank; Mizuho Holdings, Inc. and Mizuho Corporate Bank, Ltd.; Bank One; Credit Lyonnais, New York Branch; Bank of Tokyo–Mitsubishi, Ltd.; Highland Capital Management, L.P.; PNC Bank, National Association; Prudential Insurance Company of

America and Pruco Life Insurance Company; Doe Wachovia Certificate Holders Nos. 1–1,000; and Doe FUNB Certificate Holders Nos. 1–1,000. The lenders served as trustees, agents, lenders, note holders, or certificate holders in Heilig–Meyers' complex financial structure.

### Debtors' Financial Structure

As Heilig–Meyers expanded through acquisitions and organic growth, it developed a complex financial structure that financed its acquisitions and its day-to-day working capital needs. This structure included the following components:

(1) *Prudential Notes.* MacSaver issued to Prudential $60,000,000 of 11.99% Series A Guaranteed Senior Notes due in 2002 pursuant to a Note Agreement dated January 13, 1995, with MacSaver as issuer, Heilig–Meyers as guarantor, and Prudential as purchaser.

(2) *Credit Agreement.* On July 18, 1995, MacSaver as borrower and Heilig–Meyers as guarantor entered into a new Credit Agreement with Wachovia as agent to provide up to $400,000,000 in revolving loans and letter of credit facilities to MacSaver, Heilig–Meyers, and its other subsidiaries.

(3) *Wachovia Synthetic Lease.* In January and August 1996, the Furniture Company entered into two synthetic lease arrangements with Wachovia including distribution centers, office buildings, and other properties located in Richmond, Virginia; Hesperia, California; Mount Sterling, Kentucky; and Athens, Texas. The obligations of the Furniture Company under the Wachovia synthetic leases were guaranteed by Heilig–Meyers.

(4) *First Union Synthetic Lease.* In August 1998, the Furniture Company entered into a synthetic lease arrangement with First Union National Bank evidenced by a lease agreement and a trust agreement. The obligations of the Furniture Company were guaranteed by Heilig–Meyers.

(5) *Bonds.* MacSaver issued three series of unsecured notes, referred to as bonds, aggregating $475,000,000 and that were due in 2002, 2003, and 2007. The bonds were governed by an indenture agreement dated August 1, 1996, and the obligations under the bonds were guaranteed by Heilig–Meyers.

(6) *Accounts Receivable Securitization Facilities.* Heilig–Meyers developed an accounts receivable securitization program through which MacSaver transferred, through true sales, the substantial majority of the consumer installment contracts generated by the Furniture Company to a Master Trust. The Master Trust issued certificates to investors that provided the capital for the Master Trust to purchase the installment sales contracts from MacSaver. By the end of fiscal year 2000, MacSaver had three series of securitizations: (a) the 1997–1 certificates in the amount of $115,000,000 and known as the conduit facility; (b) the 1998–1 certificates in the amount of $400,000,000; and (c) the 1998–2 certificates in the amount of $311,000,000. Through these securitization facilities Heilig–Meyers received advance rates of approximately 85% against eligible receivables and paid interest ranging between 5.2% and 6.6% on the certificates. MacSaver also received undivided interests in the receivables sold to the Master Trust representing the surplus value of the receivables sold into the program. This securitization financing was without recourse to any of the debtors, although Heilig–Meyers contractually agreed to serve as the servicer of the receivables portfolio. The securitization facilities

provided the debtors working capital in the form of monthly cash payments of approximately $80,000,000 from the Master Trust.

As a result of this financial structure, Heilig–Meyers and MacSaver were the sole obligors on the Prudential notes, the bank Credit Agreement, and the bonds. Furniture Company and Heilig–Meyers were the sole obligors with respect to the synthetic leases. Heilig–Meyers was the sole obligor with respect to the servicing obligations under the securitization facilities.

### 2000 Financial Challenges

Heilig–Meyers faced a number of financial challenges during calendar year 2000. In particular, it faced the following maturity and liquidity events:

(1) the Credit Agreement was scheduled to mature in July 2000 and Heilig–Meyers required a waiver or amendment of financial covenants under this facility in order to prevent default;

(2) the commitment termination date with respect to the conduit facility was scheduled to occur in July 2000;

(3) the First Union synthetic lease was scheduled to mature and unless extended would require the Furniture Company to repay $15,000,000;

(4) Heilig–Meyers would have to fund a $40,000,000 spread account under the receivable securitization facilities if its long-term unsecured debt rating fell below a BB–rating by Standard & Poor's or below a Ba3 rating by Moody's Investors Service, Inc.; and

(5) August 2000 was the earliest possible date by which an accumulation would potentially begin and require the building of a sinking fund and that would reduce by $20,000,000 the cash flowing from the Master Trust to Mac-Saver on a monthly basis.

### The May 25, 2000, Transfers and Granting of Liens

Faced with these financial challenges, Heilig–Meyers began negotiating with the lenders in March 2000 to restructure the various components of its financial structure. These negotiations resulted in the execution of a term sheet that included requested covenant relief, maturity extensions, and partial collateral for the lenders.

By mid-May 2000, Heilig–Meyers management began to believe that the restructuring contemplated by the March term sheet would not provide debtors with sufficient liquidity throughout the fiscal year. Roy Goodman, Heilig–Meyers Chief Financial Officer, therefore requested additional modifications to the Credit Agreement. These modifications were: (1) to allow MacSaver and Heilig–Meyers to use as general working capital up to $20,000,000.00 of the revolver that had previously been dedicated solely to fund a spread account in the event of a downgrade; and (2) to allow Heilig–Meyers to use an additional $20,000,000.00 of proceeds from its sale of non-operating assets to fund any spread account as required by the securitizations, rather than using those proceeds to cash collateralize the lenders' outstanding letters of credit. The lenders agreed to these additional modifications.

On May 25, 2000, Heilig–Meyers, Mac-Saver, and the lenders executed a set of agreements including:

(1) Amendment 9 to the Credit Agreement;

(2) Amendment 3 to the Prudential Note Agreement;

(3) a security agreement, which granted security interests on certain accounts, general intangibles, seller notes from debtors' asset divestitures, and other forms of personal property to Wa-

chovia as collateral agent for the lenders;

(4) a pledge agreement;

(5) assignments of cash collateral accounts;

(6) assignment of a non-operating cash escrow account;

(7) various mortgages, deeds of trust, and UCC–1 financing statements in favor of the lenders; and

(8) an Intercreditor and Sharing Agreement among Heilig–Meyers and the lenders.

Between the closing of the May 25 transactions and the filing of debtors' bankruptcy petitions, debtors continued to borrow money from and make cash payments to the lenders under the revolving line of credit. It is these May 25, 2000, liens and related cash payments granted or made to the lenders by debtors that are the focus of this litigation.

Additional facts are stated in the discussion section below.

## DISCUSSION AND CONCLUSIONS OF LAW

At the time of trial the bankruptcy cases of plaintiffs, Heilig–Meyers Company and its five subsidiaries, had been consolidated for procedural purposes. Previously, the court had ruled on summary judgment motion that the burden of proof on the issue of insolvency was shifted to the consolidated debtors. At trial the parties presented their valuation evidence on a consolidated basis. Thus, the court's ruling on the preference issue relies on the consolidated valuation evidence of record and represents a determination of plaintiffs' solvency on this basis. Subsequent to trial, the defendants have asserted that in some respects the debtor entities should be considered separately. The court's ruling does not attempt to anticipate issues of consolidation that were not raised at trial.

*Preferential Cash Transfers and Liens*

■ In this proceeding debtors are attempting to avoid the May 25, 2000, (prepetition) transfers of cash and liens that allegedly preferred defendant lenders over other creditors of debtors. Bankruptcy Code § 547(b) states that a trustee in bankruptcy may:

avoid any transfer of an interest of the debtor in property—(1) to or for the benefit of a creditor; (2) for or on account of antecedent debt owed by the debtor before such transfer was made; (3) made while the debtor was insolvent; (4) made—(A) on or within 90 days before the date of the filing of the petition ...; and (5) that enables such creditor to receive more than such creditor if— (A) the case were a case under chapter 7 ...; (B) the transfer had not been made; and (C) such creditor received payment of such debt.

11 U.S.C. § 547(b). The trustee has the burden of proving these elements by a preponderance of the evidence. *See* 11 U.S.C. § 547(g); *Matson v. Strickland (In re Strickland)*, 230 B.R. 276, 281 (Bankr. E.D.Va.1999). Pursuant to § 1107(a), a chapter 11 debtor in possession has, with a few exceptions not relevant here, all the rights and duties of a trustee and therefore may seek to avoid preferential transfers. *See* 11 U.S.C. § 1107(a).

■ As a result of the two motions for summary judgment the elements of the preference analysis that the court must address have been reduced and refined. Of the five elements of § 547(b), the court need only make a determination with regard to § 547(b)(3), whether the debtors were insolvent on the date of the transfers at issue, May 25, 2000. The burden of proving debtors' insolvency has also shift-

ed. Section 547(f) states that debtors are "presumed to have been insolvent on and during the ninety days immediately preceding the date of the filing of the petition." 11 U.S.C. § 547(f). A preference litigation defendant may rebut this presumption with evidence that the debtor was solvent at the time a subject transfer was made. *See Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30, 34 (2d Cir.1996); *Miller & Rhoads, Inc. Secured Creditors' Trust v. Abbey (In re Miller & Rhoads, Inc.)*, 146 B.R. 950, 955 (Bankr.E.D.Va.1992).

■ As noted above, the burden has been shifted to debtors to prove their consolidated insolvency by a preponderance of the evidence. In partially granting lenders' summary judgment motion on the burden of proof issue, the court primarily relied on the following factors: (1) the debtors' audited financial statements on February 29, 2000, showing shareholders' equity in excess of $500,000,000; (2) Securities Exchange Commission Form 10–Q of debtors for May 31, 2000, showing similar shareholders' equity; (3) debtors' bankruptcy schedules of August 16, 2000, showing shareholders equity in excess of $400,000,000; (4) the repeated statements and admissions of debtors' former senior management even with the benefit of hindsight that debtors were solvent on May 25, 2000. The court recognized that ordinarily, financial statements prepared under GAAP principles do not reflect the value of a company's assets at fair market value. However, the combination of the financial data combined with the repeated assertions of solvency by debtors' former management persuaded the court to grant summary judgment on this issue. The assertions of solvency by some of debtors' former management continued at trial.

*General Insolvency Analysis*

■ In order to avoid an alleged preferential transfer, the debtor must have made the transfer while insolvent. *See* 11 U.S.C. § 547(b)(3). The Bankruptcy Code defines insolvent as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at fair valuation ...." 11 U.S.C. § 101(32)(A). Section 101(32)(A) establishes that the insolvency analysis under § 547(b)(3) is no more than a debts versus assets analysis, and for the court to find that a preferential transfer occurred the court must determine that the dollar sum of the debtor's debts are greater than the dollar sum of the debtor's assets "at fair valuation." The dollar sum of a debtor's contractual debts, such as bonds, credit lines and notes payable, are most often readily determinable by examining the debts' contractual terms. The dollar sum of the same debtor's assets "at fair valuation," however, is not readily determinable because a hypothetical market of myriad buyers and sellers and not contractual terms establish "fair valuation." As an observer would expect, in the instant adversary proceeding the parties' valuations of debtors' liabilities do not vastly differ, but their valuations of debtors' assets at "fair valuation" do vastly differ.

The court relies on two mutually independent approaches to determine whether the dollar sum of the debtors' debts exceed the fair valuation of the debtors' assets. A balance sheet test of insolvency relies on the testimony of the parties' expert appraisals to conclude with a dollar figure equal to debtors' solvency or insolvency. A second approach relies on an analysis of the debtors' circumstances at the time of the alleged preferential transfers and does not conclude with a dollar figure that corresponds to debtors' solvency or insolvency.

Balance Sheet Test of Insolvency

▮ Although not defined by the Code, a survey of case law reveals that a determination of fair valuation requires a two-part analysis. First, the court must determine whether on the date of the subject transfer the debtors were collectively operating as a going concern or were on their deathbed. *See Wolkowitz v. American Research Corp. (In re DAK Industries, Inc.),* 170 F.3d 1197, 1199–1200 (9th Cir.1999); *In re Miller & Rhoads, Inc.,* 146 B.R. at 955; *Fryman v. Century Factors, Factor for New Wave (In re Art Shirt Ltd., Inc.),* 93 B.R. 333, 341 (E.D.Pa.1988); *Schwinn Plan Committee v. AFS Cycle & Co., Ltd. (In re Schwinn Bicycle Co.),* 192 B.R. 477, 486 (Bankr.N.D.Ill.1996). Second, the court must determine the value of the debtors' assets using either a balance sheet test if the debtors were a going concern or a liquidation test if the debtors were on their deathbed. *See In re DAK Indus., Inc.,* 170 F.3d at 1199; *In re Miller & Rhoads,* 146 B.R. at 955; *In re Art Shirt Ltd., Inc.,* 93 B.R. at 341; *In re Schwinn Bicycle Co.,* 192 B.R. at 486.

GOING CONCERN VERSUS DEATHBED

▮▮ This court has defined the condition of a debtor on its deathbed as one where the debtor is "in a precarious financial condition" so that "liquidation was imminent when the petition was filed," and the debtor "could continue in business postpetition for only a brief period." *In re Miller & Rhoads,* 146 B.R. at 955–56. Other courts describe a deathbed debtor as one only "nominally in existence"[3] or "wholly inoperative, defunct or dead on its

feet."[4] When a court finds that a debtor was on its deathbed, it must apply a liquidation test to determine insolvency. Under this test, the value of a debtor's assets is the aggregate price the assets would fetch at a liquidation or distress sale. In applying this test, courts may rely on actual sale prices received for debtor's assets. *See In re Schwinn Bicycle Co.,* 192 B.R. at 489; *In re Miller & Rhoads, Inc.,* 146 B.R. at 957.

▮ If a debtor is operating as a going concern the court must perform the applicable balance sheet test of insolvency. The going concern threshold is very low; a debtor may be financially unstable, but it is still a going concern as long as the amount it could realize from converting its assets to cash in the ordinary course of business exceeds the expenses of conducting business. *See In re Taxman Clothing Co., Inc.,* 905 F.2d 166, 170 (7th Cir.1990); *see also In re Art Shirt Ltd., Inc.,* 93 B.R. at 341 (stating that "a business does not have to be thriving to receive going concern valuation"). After a court finds that a debtor is a going concern, it must apply a balance sheet test to determine insolvency. The balance sheet test "contemplates a conversion of assets into cash during a reasonable period of time." *Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.),* 134 F.3d 188, 194 (3rd Cir.1998); *see In re Roblin Indus., Inc.,* 78 F.3d at 35. The value of a going concern debtor's assets is therefore the assets' estimated aggregate fair market value assuming there is a willing buyer, and the sale is completed within a reasonable time to pay the debtor's debts. *See In re Roblin Indus., Inc.,* 78 F.3d at

---

**3.** *In re Art Shirt Ltd., Inc.,* 93 B.R. at 341 (citing *In re Randall Constr., Inc.,* 20 B.R. 179, 184 (N.D.Ohio 1981); *In re Utility Stationery Stores, Inc.,* 12 B.R. 170 (Bankr. N.D.Ill.1981)).

**4.** *In re Bellanca Aircraft Corp.,* 56 B.R. 339, 387 (Bankr.D.Minn.1985).

35–36. In applying this test courts should not rely solely on asset book values contained in debtors' financial statements or bankruptcy schedules but should consider other sources of information such as expert opinions, appraisals, and the debtor's actual operating experience. *See id.* at 36–38; *Devan v. CIT Group (In re Merry–Go–Round Enterprises, Inc.),* 229 B.R. 337, 342–343 (Bankr.D.Md.1999); *Foley v. Briden (In re Arrowhead Gardens, Inc.),* 32 B.R. 296, 299–300 (Bankr.D.Mass.1983); *see also In re DAK Indus., Inc.,* 170 F.3d at 1200.

█ In this case, the court finds that debtors were operating as a going concern on May 25, 2000. While a debt restructuring may have been necessary on that date on account of management's liquidity concerns, there is no doubt that debtors had sufficient assets to continue operating for some period into the future.

Although used only as a starting point, the financial statements filed by debtors for periods covering the date of the transfers confirm their operation as a going concern. On March 22, 2000, debtors received an unqualified audit opinion of their financial statements from Deloitte & Touche.[5] The audited fiscal year 2000 financial statements showed debtors had positive equity of $534,700,000.[6] On July 17, 2000, debtors filed with the Securities and Exchange Commission its 10–Q for the quarter ending May 31, 2000. The financial statements included in this filing indicated debtors had a positive equity value of $518,000,000.

█ Further evidence of debtors' operation as a going concern on May 25, 2000, is found in their ability to continue to function today, albeit under a reduced basis, over four years after having filed their petitions. A debtor's ability to continue to conduct business is evidence of its operation as a going concern. *See In re DAK Indus., Inc.,* 170 F.3d at 1200; *In re Taxman Clothing Co., Inc.,* 905 F.2d at 169. A debtor on its deathbed, by contrast, normally cannot conduct business long after making allegedly preferential transfers or filing its bankruptcy petition and is forced to liquidate. *See Gillman v. Scientific Research Prods. Inc. of Del. (In re Mama D'Angelo, Inc.),* 55 F.3d 552 (10th Cir.1995); *In re Miller & Rhoads,* 146 B.R. at 956; *Jahn v. Reading Body Works, Inc. (In re Fassnacht & Sons, Inc.),* 45 B.R. 209 (Bankr.E.D.Tenn.1984); *Util. Stationery Stores, Inc. v. Am. Portfolio (In re Util. Stationery Stores, Inc.),* 12 B.R. 170 (Bankr.N.D.Ill.1981).

## VALUATION EVIDENCE

█ The parties rely principally upon their expert witnesses to prove or disprove debtors' insolvency on the date of the restructuring. The experts, Jonathan Cleveland for debtors and Ronald Greenspan for the lenders, produced lengthy valuation reports and testified extensively at trial. As might be expected, they arrived at widely varying conclusions. The disparity between their valuations can be blamed in part upon the experts' opposing definitions of the balance sheet test. In his report, Cleveland defined the balance sheet test as

5. Compare Heilig–Meyers' receipt of an unqualified audit opinion to debtor Miller & Rhoads' receipt of a qualified audit opinion. *See In re Miller & Rhoads,* 146 B.R. at 955 (stating that Miller & Rhoads, a debtor this court found to be on its deathbed, received qualified financial statements conveying its auditor's "substantial doubt that [debtor]

would be able to continue to operate as a going concern for the next twelve months").

6. Shareholders' equity is expressed as total assets minus total liabilities. Positive equity indicates that an entity's assets exceed its liabilities.

"the fair value of all assets sold individually compared to liabilities." Cleveland Report at 9. Greenspan defined the balance sheet test as "the use value of [their] assets to the [debtors] ... including [their] operational goodwill." Greenspan Report at 20. A summary of the valuation reports follows.

### Debtors' Expert, Jonathan Cleveland

Cleveland's report concludes that on the transfer date of May 25, 2000, debtors were insolvent by $330,000,000 on a consolidated basis. Cleveland Report at 13. He assessed his values on this date under a balance sheet test for value (assumed sale of each marketable asset). Cleveland's general view is that the debtors' business in May 2000 was not viable. His testimony at trial and the rhetoric of his report assert that the debtors were on their deathbed on the transfer date. However, he also testified and has stated in his report that he made his "assessment of solvency under an assumed going-concern sale of the retail furniture business...." Cleveland Report at 6. Cleveland's approach to the valuation derives from his view that in May 2000 debtors faced a liquidity crisis that it could not overcome. Indeed, the debtors' liquidity problems are the basis of their underlying position in this case.

The lenders have argued that Cleveland's asset values are too low because he based values on the liquidation sales of assets realized by debtors in the chapter 11 case. Debtors dispute this argument, but Cleveland's report suggests he was influenced by these sales. Cleveland Report at 11.

In addition to a balance sheet test of solvency, Cleveland applied a "market multiple analysis," which, he states, "determines whether the going-concern value of the retail operating assets sold as a single operating enterprise, combined with the recovery value on the non-operating assets ... exceed the stated amount of liabilities." Cleveland Report at 88. He concludes that a market multiple approach does not apply to debtors because "there was no reasonable prospect of a going-concern sale of the [debtors] retail operations" in May 2000. Cleveland Report at 89. The primary argument underlying this conclusion: in spite of the restructuring of its debt, debtors required a substantial capital infusion that was unlikely. Cleveland nevertheless undertakes a market multiple analysis as support for his balance sheet calculation of insolvency and determines in this approach an insolvency range for debtors between $469,636.000 and $263,776,000. Cleveland Report at 117.

### Lenders' Expert, Ronald F. Greenspan

Greenspan also evaluated debtors on a consolidated, going concern basis, concluding that on May 25, 2000, debtors were solvent with a net worth of $218,000,000. Greenspan Report at 31. He disputes that there was any liquidity crisis and ascribes the company's subsequent failure and destruction of its going concern and asset values to "its ill conceived bankruptcy filing on August 16, 2000." Greenspan Report at 3. His report strongly suggests that a new financial advisor hired by debtors in July 2000 steered the company toward bankruptcy because the advisor was to receive a substantial transaction fee if the company reorganized in bankruptcy. Greenspan Report at 14.

Greenspan's appraisal presents a calculation of the debtors' "enterprise value" to which he adds the value of "non-core" assets and subtracts liabilities. He states there are three recognized approaches to reaching the market value of an enterprise: (1) market multiple, (2) transaction multiple or comparable sales, and (3) dis-

counted cash flow. His primary valuation approach for debtors is the market multiple. Greenspan Report at 26–31.

To summarize and simplify Greenspan's market multiple appraisal of debtors, he selected a group of publicly traded "guideline companies" that he considered "economically and operationally" comparable to debtors. From the published financial information of these companies, he compiled various financial data, such as earnings and cash flow. From this data, he calculated "multiples used to develop indications of value...." His primary multiple and the one used for the ultimate valuation of debtors was earnings before interest, taxes, depreciation and amortization (EBITDA). The earnings and cash flow multiples for the comparable companies are also based upon stock market prices. According to Greenspan, "a stock investment in the comparable ... companies could represent an alternative investment for an investor in [debtors]." Greenspan Report at 28.

Greenspan then compared similar financial data for debtors and determined adjusted multiples for debtors. These multiples were compared to those of the guideline companies. Greenspan's market multiple methodology thus involved multiplying earnings and cash flow measures (EBITDA) of the debtors by an appropriate multiple of representative earnings and cash flow of the comparable entities.

Greenspan also added a control premium to the multiples. He described this as "the additional value attributable to a controlling interest in a company when compared to a minority interest position." Greenspan Report at 29.

Greenspan appraised debtors' equity value using two alternate valuation approaches. He performed a discounted cash flow analysis based on debtors' future income projections. This analysis project-ed a range of equity in the company from a low of $168,000,000 to a high of $268,000,000.00. Finally, he made an individual asset and liability balance sheet analysis that produced stockholders' equity of $218,000,000. This approach will be discussed in more detail below.

## ANALYSIS OF APPRAISERS' VALUATION EVIDENCE

In summary, debtors' Form 10–Q for the quarter ending May 31, 2000, reported assets of $1,354,710,000, liabilities of $836,298,000, and positive stockholder equity or solvency of $518,412,000. Debtors' expert witness Cleveland has appraised these same assets to have a fair value of $459,548,000; the lenders' expert Greenspan appraises the assets to have a fair value of $1,012,040,000. On the critical preference date of May 25, 2000, Cleveland's opinion is that debtors were insolvent with an equity deficit of ($330,181,-000). According to Greenspan, debtors were solvent by $218,000,000. Because the experts' determinations of debtors' liabilities are not substantially different, almost the entire difference between the solvency opinions comes from their appraisals of debtors' assets.

In their reports and testimony, the experts discuss the debtors' asset groups individually, explaining in great depth their respective appraisal methodologies and stating the vastly different yet precise appraisals of debtors' assets at fair valuation. However, the court is unable to find that one expert report presents the correct valuation to the exclusion of the other.

Intangible financial assets, including debt and equity securities, are subject to precise rules of valuation, and experts generally value financial assets based on their exhibition of some limited objective elements including among others, liquidity, the risk free rate of interest and standard

deviation or volatility. The instant debtors on the other hand in May 2000 were comprised of thousands or tens of thousands of tangible and intangible assets, classed in asset groups such as inventory, real property, equipment, accounts receivable and prepaid expenses. No short list of objective elements reflects all of debtors' assets, and the endless variables in the experts' appraisals of debtors are demonstrated by the astonishing $552,492,000 difference in their valuations of assets that have a book value of $1,354,710,000.

The court recognizes the theoretical validity of the valuation methods presented here, that they are widely accepted in the business and financial world, and also that the values produced are approximations, couched in terms of a range of values. However, the fact that two qualified appraisers, both attorneys, both applying sound appraisal methodologies to the same set of assets could reach such absurdly disparate conclusions gives the court pause. At the least, the difference in valuations presents a predicament for the court, which does not have the expertise to parse through the experts' reports and testimony, separating the wheat from the chaff, and come to a precise measure of the debtors' solvency or insolvency.

While the experts confront the court with a difficult task that must be embraced, the court notes "the irony that judges, few of whom would qualify as expert witnesses in any trial of asset valuation, regularly determine the worth of assets, sometimes forced to choose between the conflicting reports of undisputed experts." *Domestic Loan and Inv. Bank v. Mann (In re Mann)*, 249 B.R. 831, 839 (1st Cir. BAP 2000); *but see Johnson v. Asset Mgt. Group, LLC, (In re Johnson)*, 226 B.R. 364, 369 (D.Md.1998) ("The fact that courts may be concerned with drawing sharp lines with harsh effects does not excuse the need for doing so.").

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and its progeny provide the court with little assistance. Although, under *Daubert*, the court serves as "gatekeeper," Cleveland and Greenspan are qualified appraisers and easily pass the many faceted *Daubert* inquiry that *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149–151, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), also applied to non-scientific, even experience based, expert testimony. *See also United States v. Hammoud*, 381 F.3d 316, 336–337 (4th Cir.2004) ("When … expert testimony is not scientific in nature, the [court] must still perform the gatekeeping function."), following *Kumho Tire Co. Ltd.*, 526 U.S. at 147–149, 119 S.Ct. 1167.

The court's problem with accepting asset values presented in the appraisal reports may be simply stated. It appears that Cleveland's appraisal relies to some extent on post-petition sales of debtors' assets, which makes it more akin to a liquidation analysis than the required fair value analysis. Greenspan's report seems to be the stronger of the two, and his appraisal has ultimately persuaded the court that the debtors were not insolvent on the critical date. However, although his market multiple calculation is undoubtedly a textbook example of this approach to valuation of a business enterprise, it is difficult to accept Greenspan's equity determination at face value because the court is not certain that his method has fully factored in debtors' unique circumstances as disclosed by the trial record.

A brief review of these circumstances will be helpful to explain my concerns. In 1998, Heilig–Meyers was the largest furniture retailer in the United States with more than 1,200 stores. Although in the

late 1990s the company had annual revenues of almost two billion dollars, sales were falling and the company had suffered losses. The company was very substantially leveraged, with several large financing facilities outstanding to the defendants in this proceeding. Probably more significant than any other element of the company's business operations was its accounts receivable securitization program, the receipts from which were the life blood of the business, producing monthly cash of approximately $80,000,000. The fundamental problem with this business was the company's outdated credit practices, under which installment credit departments were operated in each furniture store. Each location was responsible for extending credit and collecting its receivables. This system was outdated because the universal use of credit cards was taking the place of the type of individual store credit accounts that had sustained Heilig for many years. The company's management recognized the problem and had undertaken a new initiative to replace the old credit system as well as to upgrade stores and make other improvements. In early 2000, however, it was far from clear that debtors would be able to modernize their business model so as to achieve their previous success.

In the Spring of 2000, the company was faced with upcoming cash needs that included the maturity of several of its bank credit facilities, an obligation to fund $20,000,000 per month toward a sinking fund related to the securitization program commencing as early as August, and the necessity to fund a $40,000,000 spread account under the securitization facility in the likely event that company's long-term unsecured debt rating fell.

The bank debt was restructured on May 25, 2000, and the urgent bank maturities were extended for a year. Still, the company faced its other liquidity problems. After management decided not to pay bondholder interest due on August 1, 2000, the company could no longer count on the monthly securitization payments that it relied upon to operate. This left the company no option but to file bankruptcy, which it did on August 16.[7]

The above is an outline of the scenario for which Greenspan determined his market multiple enterprise value of the debtors on the date of the restructuring. As related earlier, he compared Heilig's adjusted financial data to adjusted financial data of a group of "guideline companies," other publicly traded furniture retailers. His report states that the multiples for the comparable companies were based in part upon stock market prices because a stock investment in one of these companies could represent an investment in Heilig. However, the evidence in this case fails to demonstrate that the financial circumstances of the comparable companies were remotely comparable to the debtors' financial circumstances, particularly with respect to the debtors' apparently unique securitization program and the dire threat it presented to debtors' liquidity. Greenspan's "adjustments" to the financial data in reaching his multiple may or may not have closely connected up the debtors with the comparable companies. The court is just unable to tell.

Further undermining his market multiple approach in the court's view is Greenspan's insistence on increasing his base market multiple calculation by adding in the value of a premium for control. As explained in his report, a premium for control of a business's enterprise value is

---

7. There is evidence of record indicating the bankruptcy filing was timed so as to include the May 25, 2000, restructuring date within the 90 day preference period.

based upon the value of its assets as a going concern on a debt free basis and represents the additional amount a potential investor would pay in order to control the company.[8] Again, the court accepts this computation as a valid methodology recognized by the text books. However, this court finds it difficult to relate an investor's purchase of control of debtors' enterprise value to a valuation under Bankruptcy Code § 547. Moreover, the court cannot grasp the appraiser's premise that in this case a real investor could have purchased debtors' operating assets completely without regard to the complex debt structure. It is too theoretical to be useful under the present record. Cleveland was correct in stating that a premium for control should not apply to the present valuation.

In summary, the court finds that Greenspan's market multiple valuation is adequate to establish that debtors were solvent in May 2000, although he exaggerates the magnitude of that solvency. The exaggeration is carried over in Greenspan's discounted cash flow analysis, which he derived from his projections of debtors' future income. These projections are of doubtful reliability, and this analysis will not be considered.

Because it would not be feasible for the court to refine Greenspan's market multiple valuation, I will structure a balance sheet test based upon both appraisal reports and also consider other circumstances of the case that support the conclusion that debtors were not insolvent on May 25, 2000.

### Balance Sheet Test of Insolvency

Very few courts have relied upon market or transaction multiple methodologies in determining whether a debtor was insolvent on the date of an alleged preferential transfer. *See Lids Corp. v. Marathon Investment Partners (In re Lids Corp.)*, 281 B.R. 535 (Bankr.D.Del.2002); *Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply, Inc.)*, 100 B.R. 127 (Bankr.D.Mass.1989); *see also Silverman Consulting, Inc. v. Hitachi Power Tools, U.S.A., Ltd. (In re Payless Cashways, Inc.)*, 290 B.R. 689, 699 (Bankr.W.D.Mo.2003)(acknowledging use of the comparable company approach to valuation but relying instead on the balance sheet methodology introduced in *In re Taxman Clothing Co.*, 905 F.2d 166, 169 (7th Cir.1990)). Furthermore, one of the main cases relied upon by the lenders in support of their use of a market or transaction multiple methodology addresses valuation of a debtor in the context of a § 1129 plan confirmation. *See In re American HomePatient, Inc.*, 298 B.R. 152, 172–179 (Bankr.M.D.Tenn.2003). This type of case is only persuasive authority at best.

Accordingly, in addition to relying on Greenspan's market multiple analysis, the court will follow a majority of courts and adopt a balance sheet test of debtors' solvency. *See In re DAK Indus., Inc.*, 170 F.3d 1197 (9th Cir.1999); *In re Roblin Industries, Inc.*, 78 F.3d 30 (2d Cir.1996); *In re Trans World Airlines*, 134 F.3d 188 (3rd Cir.1998); *In re Taxman Clothing Co. Inc.*, 905 F.2d 166 (7th Cir.1990); *In re Merry–Go–Round Enterprises, Inc.*, 229 B.R. 337 (Bankr.D.Md.1999); *In re Arrowhead Gardens, Inc.*, 32 B.R. 296 (Bankr. D.Mass.1983).

Both appraisers performed balance sheet analyses of debtors at May 31, 2000.

---

8. Greenspan explained the difference between a premium for control of an enterprise value, which is on a debt free basis, and that for the capital stock of a company, which would take account of the company's debt.

The following chart compares the asset and liability values contained in debtors' May 31, 2000, balance sheet and the experts' reports.[9]

| | May 31, 2000 Balance Sheet Values | Cleveland Assigned Values | Greenspan Assigned Values |
|---|---|---|---|
| **Assets** | | | |
| Cash | $ 6,451 | $ 6,451 | $ 6,451 |
| Accounts Receivable | $ 136,530 | $ 81,918 | $ 119,131 |
| Retained Interest | $ 138,503 | - | $ 138,503 |
| Inventories | $ 363,382 | $215,909 | $ 363,382 |
| Other Receivables | $ 82,999 | $ 26,790 | $ 79,599 |
| Prepaid Expenses | $ 26,562 | - | $ . 26,562 |
| Net Assets Held for Sale | $ 13,782 | $ 5,800 | - |
| Property and Equipment | $ 285,515 | $ 49,417 | $ 179,220 |
| Other Assets | $ 159,586 | $ 73,263 | $ 99,192 |
| Goodwill | $ 141,400 | - | - |
| **Total Assets** | $1,354,710 | $459,548 | $1,012,040 |
| **Liabilities** | | | |
| Current Long–Term Debt | $ 681 | $ 681 | $ 681 |
| Accounts Payable | $ 118,026 | $118,026 | $ 118,026 |
| Accrued Expenses | $ 131,090 | $129,017 | $ 131,090 |
| Deferred Revenue | $ 28,506 | ($ 26,873) | $ 28,506 |
| Long–Term Debt | $ 515,737 | $515,737 | $ 515,737 |
| Deferred Income Taxes | $ 42,258 | - | - |
| Other Liabilities | | $ 53,141 | |
| **Total Liabilities** | $ 836,298 | $789,729 | $ 794,040 |
| **Total Stockholders' Equity** | $ 518,412 | ($330,181) | $ 218,000 |

The experts did not adjust the value of cash and decreased to zero the value of goodwill, so the court will not address these assets.

In valuing accounts receivable, Cleveland relied in part on figures from actual sales during the course of the bankruptcy to arrive at a going concern value of 60% of book value or $81,918,000. The proper way to value debtors' assets is to determine how much they would have fetched from a willing buyer on the date of the alleged preferential transfer. Because Cleveland has relied upon actual sales figures from after the date of the alleged preferential transfer, the court adopts Greenspan's value of accounts receivable, $119,131,000.

In a manner similar to his treatment of accounts receivable, Cleveland relied upon the performance of the Master Trust after May 25, 2000, to value at zero debtors' retained interest in those accounts receivable. Because Cleveland questionably relied on post-May 25 circumstances, the court adopts Greenspan's value of retained interest, $138,503,000.

Again, with regard to valuing inventories Cleveland relied upon information

9. All values are expressed in thousands.

gathered from post-May 25 transactions. He began with the percentage of cost recovered at going out of business sales in the Chicago market and supplemented that information with an appraisal of cost recovery related to debtors' DIP credit facility. These sources of information are rather like values achieved at distress sales, and the court therefore adopts Greenspan's value for the inventories asset category, $363,382,000.

In his expert report, Cleveland lists a number of items in the other receivables category and decreases their values based upon his knowledge of collection costs and unfavorable sales conditions. In one instance, however, Cleveland decreased the book value of the Meyers/Tabakin receivable by 93.3% to reflect a price offered during the Heilig–Meyers bankruptcy. Because of Cleveland's reliance on this post-May 25, 2000, information, the court adopts the book value of this receivable minus a 5% collection cost, or $1,415,000. Greenspan did not address the items in the other receivables category, and Cleveland's values are adopted with the one exception above to arrive at an other receivables category value of $28,105,000.

With regard to prepaid expenses, the court does not accept Cleveland's assertion that these assets should be valued at zero because they cannot be sold independently of all other assets to a willing buyer. The value of prepaid expenses may be realized when related assets are sold. A purchaser of a debtor's plant and equipment may pay more for those assets because they have been insured for the remainder of a contract term.[10] Accordingly, the court adopts the value indicated on the debtors' balance sheet, $26,562,000.

The court also adopts the balance sheet value of $13,782,000 for net assets held for sale. In his asset analysis, Cleveland again impermissibly decreased this value based upon actual sales figures from a date after May 25, 2000.

Greenspan assigns a value to the property and equipment asset category that is an adjustment to the book value to reflect his market multiple valuation as it might be allocated to specific assets. Included in this asset category is real property, which had a book value on May 31, 2000, of $142,521,000. Cleveland values real property at $60,000,000. He relies to some extent on post-petition auction sales and also upon appraisals performed by DJM Trammell Crow Company. There are other real property appraisals in the record that show higher values than the DJM appraisals. It is difficult to accept Cleveland's substantial write down of real property book values when there are conflicting appraisals and due to the fact that these operational assets must be valued on a going concern basis. Because of these factors, the court will increase his valuation of real property to $75,000,000. Otherwise, the court adopts Cleveland's property and equipment valuation, which will be increased from $49,417,999 to $64,417,000.

Finally, Greenspan has assigned a value to the other assets category, which includes various notes receivable and the value of debtors' investment in a low income housing partnership, derived from debtors' liquidation assessments. This type of valuation ignores debtors' operation as a going concern on May 25, 2000, and uses information not available on that date. The court therefore adopts Cleveland's value for other assets, $73,263,000.

10. There may be some synergies between assets, but the court does not adopt the lenders' position that it is necessary to use a market or transaction multiple analysis in order to account for all possible synergies.

**466**

One court has held that liabilities should be stated at their book amount. *TWA*, 134 F.3d at 196–97. The court's holding accorded recognition to its earlier determination to treat the airline as a going concern. The logic of this holding was that the court should not consider the market's devaluation of the debtor's publicly traded debts resulting from the creditors' post-petition fears that the debtor would cease operations and dishonor its obligations. *Id.* The court finds the holding of *TWA* relevant only to the extent that the court agrees it should ignore a decline in value of the debtors' liabilities in the hands of creditors resulting from creditors' post petition fears that debtors would not honor their debts. This adversary proceeding centers on values existing on May 25, 2000, the date of the alleged preferential transfers when the future bankruptcy petition was unknown and could not influence the market. To extent that the parties dispute the amount of debtors liabilities on May 25, 2000, the court must resolve the dispute, and following that aspect of *TWA*, *supra*, the court will do so without consideration of events occurring after May 25, 2000.

In the instant adversary proceeding, the parties do not dispute the treatment of debtors' balance sheet item titled "Long–Term Debts," which is inclusive of debtors' publicly traded or privately negotiated debts, for insolvency analysis. Both parties' experts appraise debtors' balance sheet item long-term debts at its book value of ($515,737,000), and the court adopts that amount. Both parties' experts also appraise the current portion of debtors' long-term debts at ($681,000) and appraise debtors' accounts payable at ($118,026,000). The court adopts those two amounts. Both parties' experts assign a zero dollar amount to debtors' balance sheet item deferred income taxes because they do not believe it would result in an actual liability. The court adopts a zero dollar amount for deferred income taxes.

The experts' appraisal of accrued expenses differ by ($2,073,369). Creditors' expert Greenspan adopted debtors' book value of accrued expenses. Debtors' expert Cleveland reduced accrued expenses by ($2,073,369) to eliminate a reserve for impaired assets which he believed was a non-cash accounting entry. The court accepts Cleveland's determination that the reserve is an artificial liability that should be disregarded and uses Cleveland's appraisal of ($129,017,000) for accrued expenses.

The experts' appraisal of deferred revenue vastly differ. Greenspan appraises deferred revenue equal to debtors' balance sheet value of ($28,506,000). Cleveland appraises deferred revenue, which debtors' present as a liability on their balance sheet, to have a positive value of $26,873,000 for solvency analysis. Cleveland justifies his valuation on the grounds that deferred revenue reflects the impact of a change in accounting policy to recognize revenue and expenses at the time of merchandise delivery and not merchandise sale. Cleveland credits the unrecorded receivable for inventory sold but not yet delivered, net of the associated liability, to the recovery analysis. Cleveland makes a corresponding adjustment to inventory to remove product sold but not yet delivered because he assumes that this product is unavailable for recovery in a solvency analysis. Because the Court accepts Greenspan's value for inventory and accounts receivable, the Court must also accept Greenspan's value for deferred revenue because Greenspan did not adjust receivables or inventory to offset any elimination of deferred revenue.

Finally, Cleveland alleges that there are four other liabilities that are off-balance

sheet and total to $53,141,000. The first off-balance sheet liability is a "synthetic lease net deficiency claim" of $21,429,000. To the court this liability appears to be the excess of debtors' future lease obligations with respect to certain properties over those same properties' market values. The balance sheet test for insolvency looks for liabilities debtor has at May 25, 2000, not for liabilities debtor will incur for future months' use of leased facilities. The court assigns this item a zero dollar value. A second item is a ($7,800,000) tax liability Cleveland contends that debtors *will trigger if* they sell their low income housing partnerships they created to generate tax credits. The sale triggers the tax liability, but debtors had not sold the property by May 25, 2000, and the court is not persuaded that the tax liability existed on the valuation date. The other two items are likewise untenable, and regardless, the court's acceptance of Cleveland's appraisal on these four items would not change the conclusion of its balance sheet analysis.

The following chart summarizes the court's calculation of total assets, total liabilities, and remaining shareholders' equity. After subtracting total liabilities from total assets the result is $41,629,000 of positive shareholders' equity, which represents the court's finding that on a balance sheet analysis the debtors were solvent on May 25, 2000. It must be emphasized that the asset values and result are approximations.[11]

| Assets | Court Assigned Values |
|---|---|
| Cash | $ 6,451 |
| Accounts Receivable | $119,131 |
| Retained Interest | $138,503 |
| Inventories | $363,382 |
| Other Receivables | $ 28,105 |

| | |
|---|---|
| Prepaid Expenses | $ 26,562 |
| Net Assets Held for Sale | $ 13,782 |
| Property and Equipment | $ 64,417 |
| Other Assets | $ 73,263 |
| Goodwill | - |
| **Total Assets** | **$833,596** |
| **Liabilities** | |
| Current Long–Term Debt | $ 681 |
| Accounts Payable | $118,026 |
| Accrued Expenses | $129,017 |
| Deferred Revenue | $ 28,506 |
| Long–Term Debt | $515,737 |
| Deferred Income Taxes | - |
| Other Liabilities | - |
| **Total Liabilities** | **$791,967** |
| **Total Shareholders' Equity** | **$ 41,629** |

*Other Factors Insolvency Analysis*

Given the difficulty for a precise reconciliation of the wide variation in the experts' appraisals, the court finds it prudent to consider other probative evidence in the record that has a bearing on whether debtors were solvent on May 25, 2000. Without providing a precise dollar measure, this approach is essentially a totality of circumstances analysis, and it supports the balance sheet determination of debtors' insolvency.

Bankruptcy courts and particularly the Fourth Circuit Court of Appeals have approved totality of circumstances tests to resolve disputes where a number of different factors are relevant to a particular finding. For example, this type of analysis has been used to determine issues of fraud under § 523(a)(2), fraudulent transfers and "reasonably equivalent value" under § 548(a)(1)(B), and a debtor's good faith in filing a bankruptcy petition. *See Cooper v. Ashley Communications, Inc. (In re Morris Communications NC, Inc.)*, 914 F.2d 458 (4th Cir.1990); *Carolin Corp. v. Miller*, 886 F.2d 693 (4th Cir.1989); *Universal Bank, N.A. v. Rich (In re Rich)*, 249 B.R. 709 (Bankr.N.D.Tex.2000), following *AT &*

11. All values are expressed in thousands.

*T Universal Card Services v. Alvi (In re Alvi)*, 191 B.R. 724 (Bankr.N.D.Ill.1996). Courts in this circuit also use a totality of the circumstances analysis when the United States Trustee or the bankruptcy court raise the specter of substantial abuse under § 707(b). *See Green v. Staples (In re Green)*, 934 F.2d 568, 572 (4th Cir.1991); *In re Vansickel*, 309 B.R. 189, 195 (Bankr. E.D.Va.2004).

At least one bankruptcy court has applied a similar kind of test in a preference setting by examining a debtor's overall financial health to assist in a solvency determination. *See Lawson v. Ford Motor Co. (In re Roblin Indus.)*, 127 B.R. 722, 724 (Bankr.W.D.N.Y.1991), aff'd 78 F.3d 30 (2d Cir.1996). The court recognized the usual fair valuation test of insolvency under § 101(32) but also considered other relevant factors such as the debtor's losses, negative net worth, working capital, cash availability and bank financing, adverse market conditions, and liquidity. *Roblin*, 127 B.R. at 724, 726–27. Roblin was a steel manufacturer that had suffered losses while operating at substantially reduced capacities in an adverse market in the years preceding bankruptcy; debtor could not cover its fixed costs or debt, depended on bank borrowing for operating cash, and reported a negative net worth. *Id.* at 725–26. The court noted that the debtor's financial plight lessened the likelihood that it could extend the maturity dates of bank debt or seek new sources of financing. *Id.* at 727. In affirming the bankruptcy court's finding that debtor had been insolvent, the court of appeals stated that book value, while "not ordinarily an accurate reflection of the market value of an asset," could "in some circumstances, [be] competent evidence from which inferences about a debtor's insolvency may be drawn." *Roblin*, 78 F.3d at 36 (citation omitted).

■ A similar analysis of Heilig–Meyers will be useful. "[A]ny appropriate means" may be used to prove insolvency, and the court "has broad discretion when considering evidence to support a finding of insolvency . . . ." *Matson v. Strickland (In re Strickland)*, 230 B.R. 276, 282 (Bankr.E.D.Va.1999); citing *Roblin*, 78 F.3d at 35, 38. In *Strickland*, Judge Shelley discussed *Roblin* and stated that a determination of insolvency should be based on appraisals or expert testimony "whenever it is possible." 230 B.R. at 278. There was no expert evidence in *Strickland*; the court considered debtor's schedules, which suggested debtor was insolvent on the petition date. The court found that this evidence of insolvency on the petition date was not sufficient to prove insolvency on the date of the transfer and ruled that the trustee had failed to prove the insolvency element of a preference.[12] *Id.* at 284. *See also Miller & Rhoads, Inc. Secured Creditors' Trust v. Abbey (In re Miller & Rhoads, Inc.)*, 146 B.R. 950, 956 (Bankr.E.D.Va.1992).

■ In conjunction with the expert appraisers' evidence, the court will consider factors relative to Heilig–Meyers' operations and financial situation that are similar to the *Roblin* court's factors. These will include debtors' history of profits or losses, reported negative or positive net worth, conditions of the market in which debtors competed, liquidity, bankruptcy schedules, and dividend history.

## DEBTORS' HISTORY OF INCOME OR LOSS

Debtors history of income or loss is not a picture of strength, but neither does it

---

12. The trustee had the burden of proof in *Strickland* because the defendant was an insider, and the transfer took place outside the 90 day preference period. Thus the insolvency presumption of § 547(f) was inapplicable.

show a company in desperation. Debtors reported consolidated net losses of ($58,-643,000), ($1,967,000), and ($55,143,000) for fiscal years 2000, 1999, and 1998 respectively, and consolidated net income of $40,185,000 and $41,504,000 for fiscal years 1997 and 1996, totaling to losses of ($34,-064,000) on total revenues of $10,446,214,000 and revenues from sales of $9,110,232,000 over the five-year period. Defendants' Trial Exhibit 47, Fiscal Year 2000 Report to Shareholders & Associates, Selected Financial Data, page 13. Debtors' picture is better if the one-time items, "Store Closing and Other Charges," ($25,-530,000) in 1998 and "Loss on Sale of and Write–Down of Assets Held for Sale," ($63,052,000) in 2000 are backed out. *Id.* Backing out nonrecurring items leaves debtors with consolidated net income of $54,518,000 over the same five-year period and net income of $4,409,000 for fiscal year 2000.

Debtors losses over the five year period are minor relative to its total revenues and revenues from sales, and debtors would have realized income over the five year period except for the two non recurring items. The company continued to report income from continuing operations in years leading up to its bankruptcy. For the twelve months ended May 1999 and May 2000, debtors reported consolidated earnings before taxes of ($4,871,000) and $17,195,000 and earnings before taxes from continuing operations of $22,052,000 and $18,686,000 respectively. Cleveland Report at 95. In his appraisal study Cleveland argues that debtors overstated earnings from continuing operations by underestimating "at a minimum" $8,900,000 of selling, general and administrative expenses that would continue after

divestitures of discontinued businesses. *Id.* at 96. But Cleveland's contentions do not persuade the court that debtors misreported their income from continuing operations. Debtors did not restate their 10–K of February 29, 2000, or their 10–Q of May 31, 2000, and their independent audit firm did not withdraw its year 2000 opinion. Greenspan Report at 25.

## REPORTED NEGATIVE OR POSITIVE NET WORTH

Debtors reported the following consolidated stockholders' equity under financial accounting standards: [13]

| Year | Reported Stockholders' Equity |
|------|-------------------------------|
| 2000 | $534,748,000 |
| 1999 | $605,102,000 |
| 1998 | $609,154,000 |
| 1997 | $642,621,000 |
| 1996 | $518,983,000 |

The amount of stockholders' equity reported in debtors' Fiscal Year 2000 Report to Shareholders mirrors the stockholders' equity they report in their 10–K's for the same years. Defendants' Trial Exhibit 45. They also report stockholders' equity of $518,412,000 in their 10–Q for the three months ended May 31, 2000, six days after the alleged preferential transfers. Defendants' Trial Exhibit 49.

Greenspan notes that debtors' report positive equity in their February 29, 2000, 10–K and May 31, 2000, 10–Q and that neither debtors nor their independent auditors have attempted to restate or disavow these statements. Greenspan Report at 24–25. Form 10–Q reports an unaudited May 31, 2000, balance sheet, and Greenspan infers that debtors' management and the independent auditors must still believe that debtors were solvent at February 29,

**13.** Defendants' Trial Exhibit 47, Fiscal Year 2000 Report to Shareholders & Associates, Selected Financial Date, page 13.

2000, and May 31, 2000. *Id.* at 25. The dates February 29, 2000, and May 31, 2000, are before and after the point in time that debtors now argue they were insolvent, but neither party argues that debtors were solvent on February 29, insolvent on May 25, and solvent again on May 31, and the court finds such a scenario improbable.

Greenspan's analysis on this point, however, is not flawless. The 10–K and 10–Q reflect financial accounting standards and not the fair valuation bankruptcy standard for assets imposed by § 101(32). As explained previously, debtors were operating as a going concern on May 25, 2000. Therefore the proper measure of their assets for determination of solvency under the Bankruptcy Code is the assets' estimated aggregate fair market value assuming there is a willing buyer and the sale is competed within a reasonable time to pay the debtor's debts. *See Roblin,* 78 F.3d at 35–36. The proper measure is not based on financial accounting standards, which the 10–K and 10–Q reflect. Greenspan incorrectly asserts that the absence of an amendment to the February 29, 2000, 10–K and May 31, 2000, 10–Q demonstrates debtors' or their independent auditing firm's belief that debtors were solvent at fair valuation on the date of the alleged preferential transfers. Greenspan does not address the possibility that debtors were solvent under financial accounting standards and insolvent under the Bankruptcy Code.

Greenspan even contradicts his conclusions regarding the absence of amendments to the February 29, 2000, and May 31, 2000, statements. He conducts an "Individual Asset and Liability Analysis as of May 31, 2000." Greenspan Report at 32. Under his individual asset and liability analysis, Greenspan recognizes that debtors' balance sheet reflects financial accounting values, whereas his bankruptcy analysis requires a "mark to market" valuation commensurate with the Bankruptcy Code's requirements for valuing debtors's solvency under § 547(b)(3).

Although the values debtors present in their financial reports to shareholders and in their 10–K and 10–Q are not definitive evidence contrary to debtors' contention that they were insolvent, those values are "competent evidence from which inferences about a debtor's insolvency may be drawn." *Roblin,* 78 F.3d at 36. Debtors report assets of $1,457,685,000 and liabilities of $922,937,000 in their February 29, 2000, 10–K and assets of $1,354,710,000 and liabilities of $836,298,000 in their May 31, 2000, 10–Q. Defendants' Trial Exhibits 45, 49. Debtors do not present an insolvent company in these statements.

## CONDITIONS OF THE MARKET IN WHICH DEBTORS COMPETED

In *Roblin* the debtor and the steel industry as a whole operated at about half capacity, a capacity level at near collapse and comparable to utilization rates during the Great Depression. 127 B.R. at 726. In their solvency analyses, Greenspan and Cleveland compared debtors to similar publicly traded home furnishings companies. The experts selected four of the same companies: The Bombay Company, Inc., Ethan Allen, Inc., Haverty Furniture Company, Inc., and Pier 1 Imports, Inc. Greenspan also selected LA–Z–BOY, Inc., and Value City Department Stores, Inc. Cleveland also selected Jennifer Convertibles, Inc., Restoration Hardware, Inc., and Krause's Furniture, Inc. The court examined the available 10–K's for these nine companies submitted during the years 2001 and 2002 for fiscal years ending during the year 2001. The 10–K's contain income statements for the companies for the immediate year and prior years, and the court's examination was limited to

years ending during 2001, 2000, 1999, 1998, and 1997.

Of the experts' four overlapping companies, only The Bombay Company reported a loss during the five years examined, a loss equal to less than one-percent of revenue for its year ending during 1997. Value City Department Stores reported a loss exceeding four percent of its revenue for its year ending during 2001. The companies that only Cleveland selected performed poorer than both the overlapping companies and the companies that only Greenspan selected. Jennifer Convertibles reported a loss for its year ending during 1997. Restoration Hardware reported losses for its years ending during 1999, 2000, and 2001, but only its loss for its year ending during 2001 exceeded two-percent of revenue. Krause's Furniture reported significant losses every year the court examined and entered chapter 11 bankruptcy in 2001.

Of the nine companies used by the experts and whose 10–K's the court examined, Krause's Furniture suffered significant consistent losses. Otherwise, only Jennifer Convertibles, Restoration Hardware, and Value City Department Stores reported losses that exceeded two percent of revenue, and each reported such losses only once. In light of this summary, the retail furniture market cannot be described as a market in dire straits during the years immediately before and after debtors' alleged preferential transfers and bankruptcy filing. *See Roblin,* 127 B.R. at 725.

DEBTOR'S LIQUIDITY

One of debtors' principal arguments to support their insolvency in May 2000 is that notwithstanding the restructuring of the bank debt they had insufficient sources of cash to meet cash payment obligations in the near future. A factor indicating insolvency in *Roblin* was the doubtful ability of debtor to liquidate its long-term and other debt.127 B.R. at 727. However, the impact of poor liquidity is a matter of degree, and debtors' argument on this point must not overly influence the requisite solvency analysis.

It cannot be doubted that the Heilig–Meyers debtors faced a cash crunch even on the date of the alleged preferential transfers. In the near term there were the following obligations: a $20,000,000 deposit; seasonal inventory replenishment, and vendors who supplied debtors' inventory were reducing trade credit; $18,000,000 bond interest due in August; and contributions to the 1998–2 Master Trust of approximately $20,000,000 per month. Cleveland Report at 67.

On August 1, 2000, debtors publicly announced that they had hired Lazard Freres & Co. as a financial advisor, were considering "strategic alternatives" and had deferred the $18,000,000 bond interest payment. As debtors contend, this public announcement set into motion a series of catastrophic events, including a severe downgrade of the debtors' bond rating and the termination of receivables securitization facilities that enabled debtors to liquefy and finance newly generated customer receivables. Of course, these consequences occurred more than two months after May 25, 2000.

Defendants on the other hand submitted evidence that debtors had at May 31, 2000, available borrowings of $65,000,000 and cash balances exceeding $6,000,000. These were available to debtors six days after the alleged preferential transfers. Debtors also were receiving $80,000,000 monthly cash payments from receivables securitization, and these payments did not cease until debtors made the August 1, 2000, public announcement. In fact, throughout year 2000 debtors had successfully extended every debt maturity.

On balance, it is reasonable to believe that debtors' liquidity position did not radically deteriorate prior to their August 1, 2000, public announcement that received a catastrophic response from creditors and ratings agencies. Accordingly, the evidence of debtors' liquidity crisis, while real, is not sufficient to prove they were insolvent in May 2000.

## DEBTORS' BANKRUPTCY SCHEDULES

In *Strickland,* the court examined the bankruptcy schedules as a method of determining whether debtor was insolvent on the date of transfer. 230 B.R. at 283; following *In re Trans Air, Inc.,* 103 B.R. 322, 325 (Bankr.S.D.Fla.1988). Judge Shelley reasoned that if the schedules revealed debtor was insolvent on the petition date, he was likely insolvent on the transfer date if the debts were the same at that time. 230 B.R. at 284. *See also In re Perry,* 158 B.R. 694 (Bankr.N.D.Ohio 1993).

Here, debtors' schedules A and B report total assets at book value on the filing date of $1,308,308,990 and liabilities of $884,986,672. This information is similar to that in debtors' May 31, 2000, 10–Q. Adopting Judge Shelley's *Strickland* rationale, it is unlikely debtors were insolvent on May 25, 2000, only to become solvent when they filed their bankruptcy petition. Rather, this evidence would indicate, if anything, debtors were solvent on both dates.

## DEBTORS' DIVIDEND HISTORY

Virginia corporate law prohibits a corporation from paying a dividend while insolvent or if the dividend would cause insolvency. Code of Virginia § 13.1–653(C) states:

No distribution may be made if, after giving it effect:

(1) The corporation would not be able to pay its debts as they became due in the usual course of business; or

(2) The corporation's total assets would be less than the sum of its total liabilities . . . .

Debtors' 10–Q for the three months ended May 31, 2000, reports that the board of directors declared a cash dividend of $0.02 per share on March 22, 2000, payable on May 13, 2000. These two dates were in the same quarter as the alleged preferential transfers. It seems unlikely that debtors' board of directors believed debtors were making an illegal distribution on May 13, 2000, twelve days prior to the transfers. Debtors' dividend history thus conveys an impression of solvency at a time close to the alleged preferential transfers.

## SUMMARY—THE OTHER FACTORS DEMONSTRATE SOLVENCY ON MAY 25, 2000

Debtors' did not report significant losses for the five fiscal years 1996 through 2000, and a large part of their loss was from two nonrecurring items. Their financial statements reported positive net worth for fiscal years 1996 through 2000, including net worth of $518,412,000 for the three months ending May 31, 2000. The bankruptcy schedules of August 16, 2000, reflect positive net worth. Although based on book values, the financial statements and schedules stand as some evidence of the debtors' solvency. Market conditions for the retail furniture industry were not dismal in the years leading up to debtors' bankruptcy, and their peers were generally profitable. Debtors were not without cash to meet operating and debt servicing needs at May 25, 2000. Their serious cash shortage occurred closer to the date of bankruptcy filing. Finally, the dividend history evidences the directors' belief that debtors were solvent at a time close to the preferential transfer.

The other factors analysis leads to the inevitable conclusion that debtors have been unable to carry their burden of proving insolvency by a preponderance of the evidence.

RELEVANCE OF OTHER RELATED TESTIMONY

A final issue, related to liquidity, and raised repeatedly at trial and in the parties' memoranda of law should be addressed: the relevance of trial testimony regarding the necessity for debtors to file bankruptcy. The lenders assert that the following testimony offered on behalf of debtors by Heilig–Meyers managers is merely a parade of strawmen designed to distract attention from the fact that the bankruptcy filing was a blunder:[14]

(1) debtors were literally out of money by May 2000;

(2) on May 25, 2000, debtors faced insurmountable maturities on various credit facilities and other liquidity hurdles;

(3) the accumulation under the 1998–2 certificate series was going to occur in August 2000 and would destroy debtors' remaining liquidity; and

(4) debtors were suffering from hidden cash losses exceeding $120,000,000 over two years.

The lenders, contending debtors were not in such dire straits, point out that as of May 31, 2000, debtors had over $150,000,000 in cash available through borrowings, bank accounts, and payments from the Master Trust. Further, the Ninth Amendment to the Credit Agreement extended all of the 2000 maturities, and debtors obtained concessions from the lenders to access $40,000,000 to use as working capital or to fund a spread account should debtors' credit rating be downgraded. Debtors also had the contractual right to defer the accumulation under the 1998–2 series until January 2001. Finally, Greenspan demonstrated at trial, and Cleveland agreed, that the cash flow history from which Cleveland concluded debtors had lost significant cash over two years was flawed in many respects.

Debtors' position is that their managers' evidence demonstrates the decision to withhold the August 1 interest payment, which led to the bankruptcy filing, was not a blunder but a necessary response to a financial emergency. They argue that their evidence of summer 2000 liquidity and maturity crises undermines the position of the lenders that the bankruptcy filing was a mistake and the product of bad financial advice.

Although the managers' evidence has not swayed the ultimate solvency analysis, the court is not dismissive of their testimony. It was credible and shed light on debtors' financial distress at the time of the restructuring. The evidence has also been useful to the determination of whether debtors should have been valued on a deathbed basis or as a going concern.

In any event, as suggested earlier the dispute over the relevance of this testimony is somewhat unavailing. Although there is reason to afford weight to the testimony of debtors' witnesses that their actions were prudent and necessary, the relevant date for purposes of this preference action is not the date of the petition filings but rather the date of the creation of the subject liens and transfers, May 25, 2000. Undoubtedly, debtors were facing significant liquidity and maturity crises when they decided to file their petitions, but debtors' condition at that time is not the primary issue.

---

**14.** According to the lenders, the decision of debtors' management not to pay interest on August 1, 2000, was the blunder that made the bankruptcy filing unavoidable.

*Preferential Transfer Defenses*

Having found the transfers were not preferential, the court need not reach the issues of the lenders' new value and ordinary course of business defenses to the preference claims.

*Fraudulent Cash Transfers and Liens*

Debtors also seek to avoid the cash transfers and grants of liens to the lenders on May 25, 2000, as constructively fraudulent transfers under 11 U.S.C. § 548(a)(1)(B). This code section allows for avoidance of fraudulent transfers made while a debtor was insolvent or that resulted in a debtor becoming insolvent. Because the court has found that debtors were solvent on May 25, 2000, they cannot prevail on their fraudulent transfer allegations either.

A separate order will be entered.